No. 56,472

FORD MOTOR CREDIT COMPANY, *Appellant/Cross-Appellee*, v. SUB-URBAN FORD, *et al., Appellees/Cross-Appellants.*

(699 P.2d 992)

Opinion filed May 10, 1985.

*Gerrit H. Wormhoudt,* of Fleeson, Gooing, Coulson & Kitch, of Wichita, argued the cause, and *Thomas D. Kitch and Rex G. Beasley,* of the same firm, were with him on the briefs for appellant/cross-appellee.

*Edward A. McConwell,* of McConwell & Sullivan, of Overland Park, argued the cause, and *Thomas Francis Sullivan,* of the same firm, was with him on the brief for appellees/cross-appellants.

The opinion of the court was delivered by

McFARLAND, J.: This complex action arises from the contractual relationships between an automobile dealership (Suburban Ford), its source of financing of inventory under a floor plan agreement (Ford Motor Credit Company), and its supplier of automobiles and parts (Ford Motor Company). The individuals named as parties to the action (Ben W. Young, Margaret C. Young, Don W. Hansard and Linda M. Hansard) are: (1) sued herein as guarantors of the contracts on behalf of Suburban Ford; and (2) seeking damages for themselves for claimed injury to Suburban Ford and for tortious interference with their contract which leased real estate to Suburban. The action between Ford Motor Credit and Suburban (Case No. 81-C-637) and the action between Ford Motor Company and Suburban (Case No. 81-C-1314) were consolidated for trial. The jury awarded the following: (1) in favor of Ford Motor Company—$194,000; (2) in favor of Ford Motor Credit Company—$214,000; (3) in favor of the individual defendants (against Ford Motor Credit)—$365,662;

and (4) in favor of Suburban Ford (against Ford Motor Credit)—$61,300 in actual damages and $1,750,000 in punitive damages. Ford Motor Credit appeals from the judgments entered against it and certain rulings of the trial court. The defendants (Suburban Ford and the named individuals) cross-appeal from certain adverse rulings of the trial court limiting their claims. No issues from Ford Motor Company v. Suburban Ford, *et al.* (Case No. 81-C-1314) are before us on appeal. We are concerned wholly with Ford Motor Credit Company (FMCC) v. Suburban Ford, *et al.* (Case No. 81-C-637).

At this point in an opinion it is customary to summarize the facts and then proceed to discuss and determine, individually, the issues presented. Such a format is, however, wholly inappropriate to this litigation. What was commenced in 1981 as a comparatively straightforward action had, by the conclusion of its 1983 jury trial, mutated into an amorphous mass of truly Amazonian proportions. From the perspective of an appellate court, which by its very nature views a case only in its entirety, the litigation herein is Amazonian in more respects than sheer bulk. The course of this litigation may be likened to the nature of the great river itself—a series of slow-moving streams meandering through unmapped lands, repeatedly dividing, rejoining and then ending in a many-channeled delta.

The trial of the action herein lasted ten weeks and, understandably, a vast amount of material is contained in the record. To include a summary of all of the evidence introduced at trial is neither desirable nor necessary for determination of the issues. The keystone to the issues before us is the legal significance of certain actions taken by Ford Motor Credit Company (Ford Credit) on March 11-13, 1981. What occurred on those dates is essentially uncontroverted. Before recounting those events, it is, however, necessary to establish the relationship of the parties as it existed at the time.

On March 19, 1976, Suburban Ford made application for a wholesale line of credit (a "floor plan" arrangement) from Ford Credit. The document, although designated "application," is agreed by the parties to be the contract under which the rights and duties of Ford Credit and Suburban, pertinent hereto, are contained. The contract, as it may properly be called, must be set forth in this opinion in some detail.

"AUTOMOTIVE WHOLESALE PLAN
APPLICATION FOR WHOLESALE FINANCING
AND SECURITY AGREEMENT

Date___March 19, 1976___

To: Ford Motor Credit Company (hereinafter called "Ford Credit")
The undersigned___Suburban Ford, Inc.___
(Dealer's Exact Business Name)
(hereinafter called "Dealer") of___910 Nelson Dr.___
(Street and Number)

Derby_____Kansas_____67037___
(City)_____(State)_____(Zip Code)

hereby requests Ford Credit to establish and maintain for Dealer a wholesale line of credit, and to make advances to or on behalf of Dealer thereunder, to finance new and used automobiles, trucks, truck-tractors, trailers, semi-trailers, buses, mobile homes, motor homes, other vehicles and other merchandise for Dealer under the terms of the Ford Credit Wholesale Plan as set forth in the January, 1973 edition of the Ford Credit Dealer Manual entitled 'Automotive Finance Plans for Ford Motor Company Dealers' or any subsequent edition thereof (hereinafter called the 'Plan'). In consideration thereof Dealer hereby agrees as follows:

"1. Advances by Ford Credit

"*Ford Credit at all times shall have the right in its sole discretion to determine the extent to which, the terms and conditions on which, and the period for which it will make advances to or on behalf of Dealer, or extend credit to Dealer, under the Plan or otherwise. Ford Credit, at any time and from time to time, in its sole discretion, may establish, rescind or change limits or the extent to which financing accommodations under the Plan will be made available to Dealer.*

. . . .

"4. Ford Credit's Security Interest

"As security for all advances now or hereafter made by Ford Credit to or on behalf of Dealer pursuant hereto, and for the observance and performance of all other obligations of Dealer to Ford Credit in connection with the wholesale financing of merchandise for Dealer, *Dealer hereby grants to Ford Credit a purchase money security interest in all such merchandise now owned or hereafter acquired by Dealer and a security interest in the proceeds, in whatever form, of any sale cr other disposition thereof* and Dealer hereby assigns to Ford Credit and grants to Ford Credit a security interest in all amounts that may now or hereafter be payable to Dealer by the manufacturer, distributor or seller of any such merchandise by way of rebate or refund of all or any portion of the purchase price thereof.

"5. Dealer's Possession and Sale of Merchandise

"Dealer's possession of the merchandise financed hereunder shall be for the sole purpose of storing and exhibiting the same for sale or lease in the ordinary course of Dealer's business. Dealer shall keep such merchandise brand new and subject to inspection by Ford Credit and free from all taxes, liens and encumbrances, and any sum of money that may be paid by Ford Credit in release or

discharge of any taxes, liens or encumbrances on any such merchandise or on any documents executed in connection therewith shall be paid by Dealer to Ford Credit upon demand. Except as may be necessary to remove or transport the same from a freight depot to Dealer's place of business, Dealer shall not use or operate, or permit the use or operation of, any merchandise financed hereunder for demonstration or otherwise without the express prior written consent of Ford Credit in each case, and shall not in any event use such merchandise illegally, improperly or for hire. Dealer shall not mortgage, pledge or loan any of such merchandise, and shall not transfer or otherwise dispose of the same except by sale or lease in the ordinary course of Dealer's business. *Any and all proceeds of any sale, lease or other disposition of such merchandise by Dealer shall be received and held by Dealer in trust for Ford Credit and shall be fully, faithfully and promptly accounted for and remitted by Dealer to Ford Credit* to the extent of Dealer's obligation to Ford Credit with respect to such merchandise. As used in this paragraph 5, 'sale in the ordinary course of Dealer's business' shall include only (i) a bona fide retail sale to a purchaser for his own use at the fair market value of the merchandise sold, and (ii) an occasional sale of such merchandise to another dealer at a price not less than Dealer's cost of the merchandise sold, provided such sale is not a part of a plan or scheme to liquidate all or any portion of Dealer's business, and 'lease in the ordinary course of Dealer's business' shall include only a bona fide lease to a lessee for his own use at a fair rental value of the merchandise leased.

. . . .

"7. Credits

"*All funds or other property belonging to Ford Credit and received by Dealer shall be received by Dealer in trust for Ford Credit and shall be remitted to Ford Credit forthwith. Ford Credit, at all times, shall have a right to offset and apply any and all credits, monies or properties of Dealer in Ford Credit's possession or control against any obligation of Dealer to Ford Credit.*

"8. Information Concerning Dealer

"To induce Ford Credit to extend financing accommodations hereunder, Dealer has submitted information concerning its business organization and financial condition, and certifies that the same is complete, true and correct in all respects and that the financial information contained therein and any that may be furnished to Ford Credit from time to time hereafter does and shall fairly present the financial condition of Dealer in accordance with generally accepted accounting principles applied on a consistent basis. Dealer agrees to notify Ford Credit promptly of any material change in its business organization or financial condition or in any information relating thereto previously furnished to Ford Credit. Dealer acknowledges and intends that Ford Credit shall rely, and shall have the right to rely, on such information in extending and continuing to extend financing accommodations to Dealer. *Dealer hereby authorizes Ford Credit from time to time and at all reasonable times to examine, appraise and verify the existence and condition of all merchandise, documents, commercial or other paper and other property in which Ford Credit has or has had any title, title retention, lien, security or other interest, and all of Dealer's books and records in any way relating to its business.*

"9. Default

"In the event Dealer shall fail to promptly pay any amount now or hereafter owing to Ford Credit as and when the same shall become due and payable or Dealer shall fail to duly observe or perform any other obligation secured hereby, or any representation made by Dealer to Ford Credit shall prove to have been false or misleading in any material respect as of the date on which the same was made, or a proceeding in bankruptcy, insolvency or receivership shall be instituted by or against Dealer or Dealer's property, *Ford Credit may take immediate possession of all property in which it has a security interest hereunder, without demand or other notice and without legal process.* For this purpose and in furtherance thereof, Dealer shall, if Ford Credit so requests, assemble such property and make it available to Ford Credit at a reasonably convenient place designated by Ford Credit, and Ford Credit shall have the right, and *Dealer hereby authorizes and empowers Ford Credit, its agents or representatives, to enter upon the premises wherever such property may be and remove same. In the event Ford Credit does acquire possession of such property or any portion thereof, as hereinbefore provided, Ford Credit may, in its sole discretion (i) sell the same, or any portion thereof, after five days' written notice at public or private sale for the account of Dealer, or (ii) declare this agreement, as wholesale transactions and Dealer's obligations in connection therewith to be terminated and cancelled and retain any sums of money that may have been paid by Dealer in connection therewith, or (iii) enforce any other remedy that Ford Credit may have under applicable law. Dealer agrees that the sale by Ford Credit of any new and unused property repossessed by Ford Credit to the manufacturer, distributor or seller thereof, or to any person designated by such manufacturer, distributor or seller, at the invoice cost thereof to Dealer less any credits granted to Dealer with respect thereto and reasonable costs of transportation and reconditioning, shall be deemed to be a commercially reasonable means of disposing of the same. Dealer further agrees that if Ford Credit shall solicit bids from three or more other dealers in the type of property repossessed by Ford Credit hereunder, any sale by Ford Credit of such property in bulk or in parcels to the bidder submitting the highest cash bid therefor also shall be deemed to be a commercially reasonable means of disposing of the same. Notwithstanding the foregoing, it is expressly understood that such means of disposal shall not be exclusive, and that Ford Credit shall have the right to dispose of any property repossessed hereunder by any commercially reasonable means.* Dealer agrees to pay reasonable attorneys' fees and legal expenses incurred by Ford Credit in connection with the repossession and sale of any such property. Ford Credit's remedies hereunder are cumulative and may be enforced successively or concurrently.

"10. General

"Dealer waives the benefit of all homestead and exemption laws and agrees that the acceptance by Ford Credit of any payment after it may have become due or the waiver by Ford Credit of any other default shall not be deemed to alter or affect Dealer's obligations or Ford Credit's right with respect to any subsequent payment or default.

"Neither this agreement, nor any other agreement between Dealer and Ford Credit, nor any funds payable by Ford Credit to Dealer, shall be assigned by Dealer without the express prior written consent of Ford Credit in each case.

. . . .

"11. Acceptance and Termination

"Dealer waives notice of Ford Credit's acceptance hereof, and this agreement shall be deemed accepted by Ford Credit at the time it shall first extend credit to Dealer under the Plan and shall be binding on Dealer and Ford Credit and their respective successors and assigns from the date thereof until terminated by receipt of written notice by either party from the other, provided, however, that any such termination shall not relieve either party from any obligation incurred prior to the effective date thereof." (Emphasis supplied.)

The application was executed on behalf of Suburban by its president, defendant Don W. Hansard, and its secretary, defendant Ben W. Young, who also were guarantors thereon.

Suburban Ford operated on premises which were leased to it by said officers and their wives. The dealership initially flourished and received a high rating from Ford Credit. This was followed by a deterioration in the relationship with the resultant lowering of ratings from "B" to "C" and then to "D" (the lowest possible rating). The rating changes were the result of Suburban's worsening financial condition and unsatisfactory audits, as well as the dealership having exceeded its credit limit. On several occasions from 1976 to 1981, Suburban was placed on "finance hold," which resulted in Suburban having to obtain advance permission from Ford Credit before it would be allowed financing for additional cars. It also would not be issued the necessary document to transfer title to a purchaser (the Manufacturer's Statement of Origin) without first paying Ford Credit for the vehicle being sold. These restrictions were imposed on Suburban due to its weak financial condition and excessive inventory.

While on "finance hold" in 1980, Suburban obtained a Small Business Administration loan for $250,000 which it needed for additional working capital. Ford Credit then lifted its "finance hold," and fully reinstated Suburban's wholesale line of credit not to exceed $1,100,000. For several months prior to March 1981, Suburban was able to carry on business normally, selecting and ordering new cars and selling the same without first having to notify or pay Ford Credit.

We turn now to the critical events of March 11 and 12, 1981.

On March 11, 1981, Ford Credit conducted an on-site wholesale audit of Suburban's new vehicle inventory. The audit revealed that Suburban owed Ford Credit $90,240 for eleven

vehicles which had been sold by Suburban and for which Ford Credit had not been paid. Art Hatch, the Ford Credit employee conducting the audit, made demand for payment from Suburban immediately after completing the audit on the afternoon of March 11, 1981. This demand for payment was refused by Suburban. Ford Credit attempted to contact Don Hansard, president of Suburban, who was the individual in charge thereof, but he had left the premises shortly after the audit had begun. By his own admission at trial, Hansard intentionally had avoided making any contact with Ford Credit between March 11 and March 16, 1981 (his first day back on the job after leaving when the audit had been commenced). The inability to contact Hansard added to Ford Credit's growing concern. Mr. Hatch, while making the audit, observed unusual activity among Suburban's employees in that they did not remain at their desks. Rumors began circulating among the employees that Suburban was closing and going into bankruptcy. By the morning of March 12, 1981, such rumors had spread to customers of Suburban who called in to check on the dealership's status. After lunch on that day, Suburban mechanics gathered up their tools and personal effects and left the premises. As an employee (Hansard's son) testified, the dealership was "out of control" and in "complete chaos."

By noon, various officers of Ford Credit were conferring with each other concerning the difficulties at Suburban. One facet of their concern was the knowledge that Suburban was going to sell several used vehicles at an automobile auction that same day. Ford Credit, as will be recalled, had a security interest in all proceeds from the sale of new cars which included traded-in used cars or the proceeds from the sales thereof. Later that same afternoon (March 12), acting upon the advice of its legal counsel, Ford Credit filed this action seeking an accounting for the proceeds of both the new vehicles sold by Suburban for which Ford Credit had not been paid and the used vehicles in which Ford Credit had a security interest. At the same time, Ford Credit obtained a temporary restraining order which, while not preventing the sale of the used cars at the auction, did restrain the auction company from delivering the proceeds therefrom until March 17, when the hearing on the temporary injunction had been scheduled. The temporary restraining order was served on March 12. No bond was required for the temporary

restraining order. Ultimately, it was determined that the proceeds from the auction should be divided $85,100 to Suburban and $15,500 to Ford Credit. There is no dispute over this division.

Suburban Ford did not open for business the following morning (March 13, 1981). After learning the dealership had failed to open, Ford Credit applied for and received a second temporary restraining order. This TRO was issued against Suburban Ford and restrained it from selling any of its new or used car inventory. The dealership had closed its doors prior to the issuance of this second TRO. The order was served later the same day.

Ford Credit took possession of the 202 new car inventory under its contractual right to repossess upon default. Of these vehicles, 150 were disposed of by "repurchase" and "rebills" which, in essence, shunts them to other components of the Ford network. No deficiencies resulted from these "in house" transactions. An additional 46 vehicles were sold by wholesale automobile auctions—each of these sales resulted in a deficiency. The parties do not state what happened to the other six vehicles but no challenge is asserted relative thereto.

Ford Credit claimed that under its contract it was entitled to $402,768.28 in damages from the defendant Suburban Ford. The trial court determined that the liability of the guarantors was the same as Suburban Ford and that issue was, accordingly, not submitted to the jury. The jury awarded Ford Credit $214,400.00.

Suburban Ford and the named individuals counterclaimed on a panorama of tort theories which may be characterized as: (1) malicious prosecution; (2) wrongfully securing restraining orders; (3) wrongful attachment; (4) abuse of civil process; (5) conversion; (6) gross negligence; (7) ordinary negligence; (8) prima facie tort; (9) tortious interference with a contract; (10) tortious interference with employment; and (11) fraud. To complete this baker's dozen of theories, breach of contract and violation of the state antitrust laws are also asserted. The issues presented in the appeal and cross-appeal center on these counterclaim theories of liability. Ford Credit contends none of these theories should have been submitted to the jury; Suburban and the named individuals contend not enough of them were submitted. Ford Credit also complains that the instructions given

relative to the claims against it were so confusing and conflicting as to require reversal. This latter point appears to be well taken, but first it is necessary to determine what, if any, of the counterclaim theories should have been submitted to the jury. The main thrust of the various tort theories is that, by virtue of its tortious acts, Ford Credit caused the collapse of Suburban Ford.

It should be emphasized that all parties to this action were in a contractual relationship with each other, and their difficulties with each other arise directly from that contractual relationship. Isler v. Texas Oil & Gas Corp., 749 F.2d 22 (10th Cir. 1984), is a well-reasoned opinion pointing out the impropriety of confusing contract and tort law. Isler involved a dispute over rental payments between the corporate owner of an oil and gas lease and the individual to whom it had farmed out the lease. The trial court entered judgment for plaintiff Isler on a negligence theory. In reversing the trial court, the Tenth Circuit held as follows:

"The very notion of contract is the consensual formation of relationships with bargained-for duties. An essential corollary of the concept of bargained-for duties is bargained-for liabilities for failure to perform them. Important to the vitality of contract is the capacity voluntarily to define the consequences of the breach of a duty before assuming the duty.

"This case is illustrative. The effect of confusing the concept of contractual duties, which are voluntarily bargained for, with the concept of tort duties, which are largely imposed by law, would be to nullify a substantial part of what the parties expressly bargained for—limited liability. Unless such bargains are against public policy (covered either by prohibitory statutes or well-defined, judge-made rules such as unconscionability), there is no reason in fact or in law to undermine them. Indeed, it would be an unwarranted judicial intrusion into the marketplace. No reason appears to support such a radical shift from bargained-for duties and liabilities to the imposition of duties and liabilities that were expressly negated by the parties themselves when they decided to abandon their status as legal strangers and define their relationship by contract. Tort law proceeds from a long historical evolution of externally imposed duties and liabilities. Contract law proceeds from an even longer historical evolution of bargained-for duties and liabilities. The careless and unnecessary blanket confusion of tort and contract would undermine the carefully evolved utility of both.

"In tort, the legislatures and the courts have set the parameters of social policy and imposed them on individual members of society without their consent. The social policy in the field of contract has been left to the parties themselves to determine, with judicial and legislative intervention tolerated only in the most extreme cases. Where there has been intervention, it has been by the application of well established contract doctrines, most of which focus on threats to the integrity of the bargaining process itself such as fraud or extreme imbalance in bargaining power.

"Further, it should not matter whether the breach of a bargained-for duty arises

from inattention, a disagreement over the existence of the duty, a dispute over the nature of the duty, or a simple unwillingness to perform the duty. The parties by contract (or in the absence of an express provision, by implied rules evolved under contract analysis) have themselves defined the consequences of the breach. In the marketplace of contract, a breach is a breach is a breach—unless the parties choose to specify otherwise.

"[T]he facts alleged in plaintiff's tort claim are precisely the same as those alleged in their contract claim. Because the contract specifically defined the rights and duties of the parties regarding rental payments and notice, thereby precluding any extracontractual tort duty regarding such payments, we must reverse the judgment for plaintiffs sounding in tort. Accordingly, we need not reach defendant's other claims.

"In their briefs, plaintiffs suggest that the jury's verdict for them in tort and against them in contract was the result of confusion. On the record in this case, such a possibility is substantial. However, plaintiffs themselves invited such confusion by introducing negligence theories into what was a straightforward contract case." 749 F.2d at 23-24.

Ford Credit had the contractual right to make the March 11, 1981, audit which triggered the collapse of Suburban Ford. The trial court's instructions provided, in part:

"INSTRUCTION NO. 22.

"Pursuant to the contract, Suburban was obligated to pay for sold vehicles, absent audit, no later than four days from the date of sale plus one day for mailing."

"INSTRUCTION NO. 23.

"Pursuant to the Automotive Wholesale Plan Application for Wholesale Financing and Security Agreement, Ford Motor Credit Company was allowed to perform audits of Suburban at reasonable times."

"INSTRUCTION NO. 21.

"Under the contract between the parties, Ford Motor Credit Company had the right to require Suburban Ford to pay Ford Motor Credit Company's auditor on the day of the audit for any motor vehicles sold by Suburban for which Ford Motor Credit Company had not yet been paid.

"Ford Motor Credit Company had the right to require Suburban's payment to be in certified funds.

"The Court has found that demand for payment was made on Suburban on March 11, 1981; that Suburban failed to pay; and that such failure was a default under the contract between the parties."

"INSTRUCTION NO. 24.

"On March 12, 1981, Suburban was not in default under the Automotive Wholesale Plan, Applications for Wholesale Financing and Security Agreement concerning any unsold vehicle which had been financed under the agreement.

"The failure of Suburban to open for business on March 13, 1981, constituted a default under the Wholesale Plan."

It should be noted that Instruction No. 24 finding no default on

March 12, 1981, relates solely to *unsold vehicles*. The "failure to pay" default of March 11, 1981, stated in Instruction No. 21, concerned *sold* vehicles.

"INSTRUCTION NO. 39.

"On April 1, 1981, this Court ruled that Ford Motor Credit Company was entitled to repossess all of Suburban Ford's new vehicle inventory financed by Ford Motor Credit Company under the Wholesale Plan."

These are correct statements of facts, are proper interpretations of Ford Credit's rights under the contract and are not challenged by any of the parties on appeal. The contract further provides that upon default Ford Credit had the right to take possession of the new car inventory it had financed even without legal process. Ford Credit resorted to legal process—but that can hardly be the basis of any tort liability.

The trial court, in its instructions, essentially held the acts of Ford Credit on March 11, 12 and 13, 1981, were authorized by the contract—a position with which we agree. However, the trial court then instructed the jury it could consider whether these same acts were actionable under various theories of tort liability. This was clearly erroneous.

Certainly the collapse of Suburban Ford caused financial loss to the individuals owning the corporation and guaranteeing its debt. These same individuals had leased real estate to the dealership and financial loss to them personally resulted from the dealership's collapse. This is unfortunate, but it creates no liability in Ford Credit any more than do creditors filing routine collection actions against debtors incur liability if their lawsuits result in the debtors' losing their businesses and having to take bankruptcy, thus causing losses to their landlords and suppliers.

Nothing would be added to this already lengthy opinion by individually discussing each tort theory and specifically finding each improper. It is sufficient to state we have reviewed each such theory and find that the trial court erred in submitting *any* tort theory to the jury. It follows, of course, that the trial court did not err in refusing to submit certain tort theories to the jury (as claimed in the cross-appeal). The awards of actual and punitive damages against Ford Credit were wholly based upon tort theories of liability and are, accordingly, reversed *in toto*.

The contractual claims raised by defendant are defensive in nature. That is, by these claims defendants sought to reduce or

eliminate the claim of Ford Credit against Suburban Ford (and the guarantors) through setoffs. The cross-appellants do not contend there was any trial court error relative to these defensive claims and the same are not issues before us, with the exception of the one such claim upon which Ford Credit predicates error. This issue relates to the propriety of the trial court's handling of the question of whether or not Ford Credit disposed of the collateral in a commercially reasonable manner. The court instructed:

"INSTRUCTION NO. 39.

"On April 1, 1981, this Court ruled that Ford Motor Credit Company was entitled to repossess all of Suburban Ford's new vehicle inventory financed by Ford Motor Credit Company under the Wholesale Plan. Ford Motor Credit Company was thereupon obligated to sell the vehicles in a commercially reasonable manner."

"INSTRUCTION NO. 40.

"In this case, the parties have agreed that the sale by Ford Motor Credit Company of any new and unused motor vehicles to Ford Motor Company at Suburban's invoice cost less any credits previously granted to Suburban and less reasonable costs of transportation and reconditioning shall be deemed to be a commercially reasonable means of disposal.

"The parties further agreed that if Ford Motor Credit Company solicits bids from three or more other dealers in the type of property repossessed by Ford Motor Credit Company, any sale by Ford Motor Credit Company of such property in bulk or in parcels to the bidder submitting the highest cash bid therefor also shall be deemed to be a commercially reasonable means of disposing of the same.

"Ford Motor Credit Company sold the repossessed vehicles in accordance with the above agreement."

"INSTRUCTION NO. 41.

"The provisions of the agreement of the parties as set forth in the preceding Instruction No. 40 are valid and binding unless they are manifestly unreasonable.

"The fact that a better price could have been obtained by a sale at a different time or in a different method from that selected by the parties in their agreement is not of itself sufficient to establish that the agreement is manifestly unreasonable.

"Suburban Ford claims that these provisions of the agreement with Ford Motor Credit Company are manifestly unreasonable.

"Suburban has the burden to prove that the provisions of the agreement are manifestly unreasonable.

"If Suburban fails to prove that the provisions of the agreement are manifestly unreasonable, then you must find for Ford Motor Credit Company on that issue.

"If Suburban proves that the provisions of the agreement are manifestly unreasonable, then you should consider Instructions No. 42-6."

The trial court then, in instruction Nos. 42, 43, 44, 45 and 46

gave rambling, confusing and inconsistent instructions on the terms "manifestly unreasonable" and "commercial reasonableness."

Suburban appears to base its claim the sales were not made with "commercial reasonableness" on speculation that if it could have sold the vehicles at retail, the vehicles would have sold for more money. This contention lacks merit. The sales were made, as found by the trial court, in accordance with the contract terms. A secured creditor is not required to leave its security with the defaulting financially distressed debtor for the debtor to sell. Such a requirement could easily transform a secured creditor into an unsecured creditor. We conclude it was error for the trial court to submit the issue of "manifest unreasonableness" to the jury. As found by the trial court the sales were within the contractual provisions for sale of repossessed inventory and no legitimate basis appears from the record which would justify instructing the jury that it could, in effect, ignore the contractual provisions relative thereto.

The difficulty with this point is that the winner thereof (Ford Credit) has no place to go with its victory. The disposition of the collateral question came up as one of several claimed setoffs. The claim of Ford Credit was for $402,768.28. The jury awarded Ford Credit $214,400. The posture of the appeal is such that we do not know whether the $402,768.28 was controverted or not or whether specific amounts were claimed for particular setoffs. We do not know if the jury allowed anything in this claimed setoff. Under such circumstances this court cannot modify the award to Ford Credit as we are not shown what, if any, part of the difference between the claim and jury award may be attributable to the improper setoff being submitted to the jury.

The judgment entered in favor of Ford Credit is affirmed. All judgments against Ford Credit are reversed and the case is remanded with directions to enter judgment in favor of Ford Credit on all claims of defendants herein.

PRAGER, J., concurs in the result.

LOCKETT, J., concurring and dissenting: I would dissent from the part of the majority decision which finds that the trial court erred when it instructed the jury to consider whether certain acts were actionable under various theories of tort liability. Based on all the facts presented to the jury, it is possible that the jury could

have found that Suburban had a cause of action for malicious prosecution against Ford Credit.

We have stated in *Nelson v. Miller*, 227 Kan. 271, 276, 607 P.2d 438 (1980), that the elements of a civil action for malicious prosecution are:

"(a) That the defendant initiated, continued, or procured civil procedures against the plaintiff.

(b) That the defendant in so doing acted without probable cause.

(c) That the defendant acted with malice, that is he acted primarily for a purpose other than that of securing the proper adjudication of the claim upon which the proceedings are based.

(d) That the proceeding terminated in favor of the plaintiff.

(e) That the plaintiff sustained damages."

The following facts, which the majority did not include in its decision, could establish an action for malicious prosecution.

On March 11, 1981, Suburban contacted its attorney who arranged for $500,000 in financing from a local bank and informed Ford Credit that arrangements were being made for payment, that funds were available up to $500,000, and that all negotiations should be conducted through him as Suburban's attorney.

During the afternoon of March 11, 1981, Ford Credit took possession of approximately 200 models of Suburban's new car inventory and four retail contracts totaling $27,198.64.

On March 12, 1981, Ford Credit took possession of all of Suburban's new vehicle inventory and posted its employees to secure the new vehicle inventory. On the same day, Ford Credit also notified the other Ford dealers in the Wichita area to acquire any stock available from Suburban's parts department.

The result of all these actions by Ford Credit was that Suburban could not open for business on March 13. Ford Credit had control of all of Suburban's new inventory and its parts. Due to the first restraining order, Suburban did not have access to the proceeds of the sale of its used inventory. Suburban could not carry on business when all of its cars, parts, and funds were under Ford Credit's control.

Suburban established that Ford Credit had initiated civil procedures against it even though there was not probable cause to do such. Suburban could not have sold the new cars or any parts since they were in Ford Credit's possession as of March 12. While Ford Credit had a contract claim against Suburban, the

second restraining order was not necessary for proper adjudication of that claim. The evidence, which shows that Suburban had funds available to make payment on its contract with Ford Credit, would indicate that Ford Credit was more interested in shutting Suburban down than allowing it to continue business. Because of Ford Credit's actions, Suburban suffered damages. The jury considered this evidence and found for Suburban. The trial court was correct in allowing an action and damages for malicious prosecution.