**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 17, 2020**

**Christopher M. Wolpert**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

JULIE FROST, co-conservator for
M.F., a minor, individually and as
heir-at-law of Elizabeth A. Frost,
deceased; SARAH BAYLESS, co-
conservator for M.F., a minor,
individually and as heir-at-law of
Elizabeth A. Frost, deceased; and
CHARLES E. FROST, JR., as
administrator of the estate of Elizabeth
Frost,

      Plaintiffs-Appellants,

v.

ADT, LLC, formerly known as
Protection One, Inc.,

      Defendant-Appellee.

No. 18-3259

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. NO. 2:18-CV-02360-JAR-GEB)**

---

Randall L. Rhodes (Steven W. Brookreson with him on the briefs), Rouse Frets
White Goss Gentile Rhodes, P.C., Leawood, Kansas, for Appellants.

Jason R. Scott (Charles C. Eblen on the brief), Shook, Hardy & Bacon L.L.P.,
Kansas City, Missouri, for Appellee.

---

Before **TYMKOVICH**, Chief Judge, **BALDOCK**, and **HOLMES**, Circuit
Judges.

**TYMKOVICH**, Chief Judge.

Elizabeth Frost lost her life when an accidental house fire ignited in her home. At the time, ADT provided security monitoring services to the premises. During the fire, ADT received several alerts through its monitoring system. Although ADT attempted to call Frost and the back up number listed on her account, it did not get through. After several such attempts, ADT cleared the alerts without contacting emergency services.

The administrator of Frost's estate and her minor heir, M.F., (collectively Claimants) brought this action against ADT. The central theme of the complaint is that ADT's failure to notify emergency services contradicted representations on its website that it would do so, and that failure wrongfully caused or contributed to Frost's death.

The district court dismissed the complaint, holding the one-year suit-limitation provision in the contract between ADT and Frost barred the claims and that Claimants failed to state a claim with respect to certain counts. Because we find the contract between Frost and ADT provides an enforceable suit-limitation provision that bars the claims at issue, we AFFIRM.

# I. Background

During the early morning hours of August 15, 2016, an accidental house fire ignited in Frost's home, claiming her life. At the time of the fire, Frost's home was equipped with a security system acquired from ADT and its predecessors. ADT provided monitoring services accompanying the security system under a contract entitled "Residential Alarm System and Services Agreement." App. at 73. Under the Contract, ADT provided round-the-clock monitoring of Frost's home security in exchange for payments of $37.99 a month. Although offered, the Contract did not cover "Smoke Detection" or "CO Detection services."

## A. Night of the Accident

At 1:30 a.m., ADT received a "sensor tamper" alert for "glass break" in Frost's dining room. App. at 12. At 1:32 a.m., ADT received an alert for "expansion module failure." *Id.* The expansion module is the key pad and system center located by the front door of Frost's home. At approximately 1:43 a.m., ADT attempted to call Frost twice, but was unable to reach her. At 1:49 a.m., ADT attempted to call Frost's grandmother, who was listed as the next contact number on Frost's account. ADT was also unable to reach Frost's grandmother. Between 2:01 a.m. and 2:04 a.m., ADT again attempted to call Frost's number and her grandmother's number, but was unable to reach either. When calling both

Frost and her grandmother, ADT's number appeared as an unlisted number and did not identify ADT as the caller. Around 2:04 a.m., without having made contact with Frost, Frost's grandmother, or any emergency services, ADT "fully cleared" the alarms. *Id.*

Around 2:52 a.m., City of Topeka Public Works Department employees noticed the house fire and called 911. First responders arrived at the scene at approximately 2:58 a.m. A fire crew conducted a search of the house and found Frost face down, unconscious, in a hallway in her home. She was still alive at the time first responders discovered her. Frost first received medical treatment at 3:07 a.m. and was subsequently transported to Stormont Vail Health Care, where she was pronounced dead. The cause of death was inhalation of smoke and soot from the fire.

### B. ADT's Website

Claimants allege that in contracting with ADT for home monitoring services, Frost "reasonably relied" on certain representations on ADT's website, including the following:

- "The ability to remotely learn of possible hazards and to dispatch responders is key to how security monitoring works."

- "24/7 professional monitoring centers will address alarms immediately to ensure that help is on the way."

- "In the event of an emergency, local police or fire assistance will be notified."

- "A trained employee immediately attempts to call you to notify you of the disturbance in case it is a false alarm.  If you confirm a false alarm, the employee will see if there is anything else you need before letting you hang up.  If the employee is unable to contact you, or if you confirm that the alarm is genuine, the authorities will be notified.  A dispatch will then send police officers to your residence to evaluate the situation."

App. at 22.

### C.  The Contract

The Contract between ADT and Frost does not contain these representations.  Instead, on the first page, under the heading "**IMPORTANT PROVISIONS — YOUR RESPONSIBILITY TO READ TERMS OF THIS AGREEMENT**" the Contract states: "**<u>SECTION 6, 7, and 8: WE ARE NOT AN INSURER, Limitation of Liability, Hold Harmless </u>which, among other things, significantly limits [ADT's] liability to you under this Contract**."  App. at 73 (emphasis in original).

Section 6 clarifies that ADT is not an insurer and that ADT's "fees" are not based on "the value of your premises or its contents, or the likelihood or potential extent or severity of injury (including death) to you or others."  App. at 75.

Section 7 limits ADT's liability to "the lesser of (i) $300.00; or (ii) Six (6) times the monthly service fee [$227.99 in this case]." *Id.* at 76.

Section 9 establishes a one-year suit-limitation period:

> **Legal Actions. NO CLAIM OR LEGAL ACTION EITHER OF US MAY HAVE ARISING OUT OF THIS CONTRACT, YOUR SYSTEM OR OUR SERVICES (WHETHER BASED ON CONTRACT, NEGLIGENCE, OR OTHERWISE) MAY BE BROUGHT MORE THAN ONE YEAR AFTER THE DATE THE CAUSE OF ACTION FOR SUCH CLAIM ACCRUED.**

App. at 76 (emphasis in original).

Section 10 outlines the monitoring services to be provided:

> . . . When the Center receives an actionable alarm signal from your system (an "Alarm Event"), we will make reasonable efforts, consistent with local laws and our response policies, to make the appropriate notifications. These notifications may include the local emergency response provider . . . , the person designated on your Monitoring Information Schedule or the monitored premises. . . .

App. at 76.

Section 22 sets out an integration clause:

> This Contract is the entire agreement between you and us, supersedes all previous contracts between you and us regarding alarm monitoring or similar services at [Frost's home]. You agree that we are not bound by and you have not relied on any representation, promise, condition, inducement, or warranty, express or implied, not included in this Contract. . . .

App. at 83.

### D. *Proceedings Below*

Claimants filed a lawsuit against ADT on July 11, 2018, more than one but less than two years after Frost's death on August 15, 2016. The complaint seeks recovery on a number of theories, including wrongful death, negligence, fraud, contract, and violations of the Kansas Consumer Protection Act. ADT moved to dismiss the complaint arguing, among other things, that the complaint was time-barred by the Contract's one-year suit-limitation provision. The district court granted ADT's motion.

## II. Analysis

The central issue is whether Section 9's one-year suit-limitation provision of the Contract is enforceable and applies to the claims presented in the complaint.[1]

The district court held that the one-year suit-limitation provision in Section 9 bars the present action. To rebut this, Claimants present a series of arguments regarding the enforceability and applicability of this provision. None of these are persuasive. To the contrary, the Contract, including Section 9, is enforceable and applicable. As a result, the complaint is time-barred.

---

[1] It is undisputed that the present claims were brought more than one year after they accrued. *See* Aplt. Reply Br. at 16.

### A. ADT's Affirmative Defenses

As a threshold matter, Claimants argue the district court should not have entertained ADT's motion to dismiss because it was "predicated on issues that are affirmative defenses." Aplt. Br. at 12. Since this argument is raised for the first time on appeal, we review for plain error.[2] To show plain error, Claimants must establish (1) an error, (2) that is plain, (3) which affects substantial rights, and (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings. *See Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1128 (10th Cir. 2011).

Because the district court did not err, the first prong of plain error review is dispositive here. Claimants rely on *Fernandez v. Clean House, LLC*, 883 F.3d 1296, 1297 (10th Cir. 2018), for the proposition that ADT's affirmative defense regarding the timeliness of this suit was not properly before the district court.[3] In

---

[2] Claimants contend this argument was raised below. *See* Aplt. Reply Br. at 5. But a review of the citations provided and an independent review of the record reveal only the most circumspect references to such an argument. In their briefing below, Claimants state, "[r]ather than addressing the causes of action actually asserted by plaintiffs, defendant is instead trying to litigate largely non-existent contractual claims that might have been brought by the decedent had she survived the fire." App. at 104. We do not view this as sufficient to raise the argument before the district court. Vague references to potential arguments do not sufficiently put the lower court on notice and accordingly fail to preserve the issue. *See Bancamerica Commercial Corp. v. Mosher Steel of Kan., Inc.*, 100 F.3d 792, 798 (10th Cir. 1996).

[3] Claimants also rely on *Shields v. U.S. Postal Service*, but this unprecedential order and judgment is similarly unavailing. *See* 729 F. App'x 662,

(continued...)

*Fernandez*, we reversed the dismissal of Fair Labor Standards Act claims as barred under the FLSA's limitations period.  Under the FLSA, plaintiffs may bring claims within two years of ordinary violations and within three years of "willful" violations.  Although plaintiffs in *Fernandez* had alleged willfulness, the district court dismissed their claims because it found they had not presented sufficient supporting allegations to make the "willful" violations plausible.  This court reversed, holding that in such circumstances plaintiffs did not bear the burden of supporting the willfulness allegation at the pleadings stage because willfulness was an element of defendants' limitations-based affirmative defense. *See id.* at 1298–99.

*Fernandez* does not stand for the broader proposition that Claimants seek to read into it.  Nothing in that case restricts district courts from interpreting contractual provisions, determining the parties' respective rights and obligations thereunder, or enforcing a dispositive suit-limitation provision at the motion to dismiss stage.

---

(...continued)
663 (10th Cir. 2018).

Here, the complaint and Contract[4] "admit[] all the elements of [ADT's] affirmative defense." *Id.* at 1299. In such circumstances, where "there is no disputed issue of fact raised by an affirmative defense, or the facts are completely disclosed on the face of the pleadings, and realistically nothing further can be developed by pretrial discovery or a trial on the issue raised by the defense" it is appropriate and expedient to dispose of a claim by a motion to dismiss under Rule 12(b). *See* Wright & Miller, Federal Practice and Procedure § 1277 (3d ed. 2002) (August 2019 update) (noting some disagreement among federal courts, but stating that the "more recent cases . . . hold that a complaint containing dates that show the claim is time-barred can be dismissed on a motion under Rule 12(b)(6)"). Although some affirmative defenses may present more difficult questions, the "statute of limitations defense is unusual in that . . . its effectiveness may well appear on the face of the complaint" as we find it does here. *Id.* Accordingly, we hold the district court did not err in reaching the suit-limitations issue.

---

[4] Claimants criticize the district court for considering the Contract, which was not attached to the complaint but was introduced as an exhibit to ADT's motion to dismiss. But district courts may consider evidence beyond the pleadings where the document is central to the claims presented and its authenticity is not disputed by the parties. *See Alvarado v. KOB-TV, LLC*, 493 F.3d 1210, 1215 (10th Cir. 2007). The Contract meets these criteria. Although Claimants state that "the contract attached to defendant's motion is not authenticated" they do not, either here or in the proceedings below, expressly challenge its authenticity. *See* Aplt. Br. at 4; App. at 104–31.

### B.  *Contract Validity and Enforceability*

Claimants next attack the validity and enforceability of the Contract.  In an appeal from an order granting dismissal under Federal Rule of Civil Procedure 12(b), we review such arguments de novo.  *Slater v. A.G. Edwards & Sons, Inc.*, 719 F.3d 1190, 1196 (10th Cir. 2013).

### 1.  *Unconscionability*

First, Claimants argue the Contract as a whole is unenforceable as an unconscionable adhesion contract.  Under Kansas law, courts look to numerous factors in assessing unconscionability, including,

> (1) the use of printed form or boilerplate contracts drawn skillfully by the party in the strongest economic position, which establish industry wide standards offered on a take it or leave it basis to the party in a weaker economic position; (2) a significant cost-price disparity or excessive price; (3) a denial of basic rights and remedies to a buyer of consumer goods; (4) the inclusion of penalty clauses; (5) the circumstances surrounding the execution of the contract, including its commercial setting, its purpose and actual effect; (6) the hiding of clauses which are disadvantageous to one party in a mass of fine print trivia or in places which are inconspicuous to the party signing the contract; (7) phrasing clauses in language that is incomprehensible to a layman or that divert his attention from the problems raised by them or the rights given up through them; (8) an overall imbalance in the obligations and rights imposed by the bargain; (9) exploitation of the underprivileged, unsophisticated, uneducated and the illiterate; and (10) inequality of bargaining or economic power.

*Willie v. Sw. Bell Tel. Co.*, 549 P.2d 903, 907 (Kan. 1976) (internal citations omitted).

Claimants engage with only a subset of these factors, arguing principally that the Contract is unconscionable because the parties lacked equal bargaining power and the Contract was presented on a "take it or leave it" basis. Aplt. Br. at 18–19. Under Kansas law, more is required—for example, substantive unfairness or some form of deception in the contracting process—to render a contract unconscionable. *See Willie*, 549 P.2d at 906–07. As the Kansas Supreme Court clarified, the principle of unconscionability is aimed at preventing oppression and unfair surprise, not disturbing the allocation of risks resulting from an imbalance of bargaining power. *See id.*

Here, the Contract's significant limitation of liability must be viewed in context. Where monitoring services are concerned, liability-limiting provisions reflect appropriate risk allocations, especially where monthly premiums are low. *See Leon's Bakery, Inc. v. Grinnell Corp.*, 990 F.2d 44, 49 (2d Cir. 1993) ("[T]he price [of a fire or burglary alarm system] does not generally include a sum designed to anticipate the possible need to pay the purchaser the value of the property that the system is to protect."). It is thus no surprise that many courts uphold monitoring services contracts with similar liability-limiting provisions. *See, e.g.*, *Corral v. Rollins Protective Servs. Co.*, 732 P.2d 1260, 1265 (Kan. 1987) (upholding a similar liability-limiting provision in a contract for burglary and fire alarm monitoring services); *see also Peter's Clothiers, Inc. v. Nat'l*

*Guardian Sec. Servs. Corp.*, 994 F. Supp. 1343, 1348 (D. Kan. 1998) (upholding similar liability-limiting provisions in a contract for security system monitoring services).

Claimants also fail to show any "cost-price disparity" or that ADT charged an "excessive price." *Willie*, 549 P.2d at 907. To the contrary, Frost's $37.99 monthly fee is reasonable in light of the services. Where consumers pay small monthly premiums, it is hardly unconscionable for liability to be appropriately limited. *See Greenspan v. ADT Sec. Servs. Inc.*, 444 F. App'x 566, 570 (3d Cir. 2011) ("The relatively low yearly service fee that the Greenspans paid reflects the fact that ADT was not the Greenspans' insurer, it was not in the business of assessing risk, and its annual service fee could not have been reasonably based on the value of the real property protected by ADT's alarm system."). The Contract here does just that. Moreover, it does so conspicuously, with large, bolded and capitalized language on the first page stating that ADT is "**NOT AN INSURER,**" notifying the purchaser that the Contract contains a "**Limitation of Liability**," and directing him to the appropriate subsections to find additional details. App. at 73–74 (emphasis in original).

Claimants rely on *John Deere Leasing Co. v. Blubaugh*, 636 F. Supp. 1569 (D. Kan. 1986), but the analogy is unpersuasive. In *John Deere*, the court found certain lease terms unconscionable where they were contained in print so light

that they did not show up in a photocopy of the document and so small that the court had to read them with a magnifying glass. The terms also used "unreasonably complex" language. *Id.* In addition to this "near concealment" of the actual terms of the contract, the court found that the substantive remedy at issue was "unusually harsh" and that it resulted in the exaction of a "penalty." *Id.* at 1574 (finding "both procedural and substantive unconscionability are present").

Unlike *John Deere*, here the complained-of provisions are contained in clear, conspicuous language and are referenced on the first page of the Contract. *See Santana v. Olguin*, 208 P.3d 328, 333 (Kan. Ct. App. 2009) (finding liability-limiting provision enforceable where it was "written in relatively plain language and set forth after an all-capital-and-bold heading that . . . signaled the importance" of the provision). Accordingly, *John Deere* fails to necessitate a finding of unconscionability.

Because the Contract's liability-limiting provisions are substantively reasonable in the context of a monitoring service agreement and were conspicuously presented, we find no substantive or procedural unconscionability.

### 2. *Gross Negligence*

Claimants also argue that ADT's "wanton" behavior and "gross negligence" invalidate certain provisions of the Contract. Aplt. Br. at 23–25. To show wanton conduct, Claimants must establish (1) the alleged acts were performed

with a realization of imminent danger and (2) that the alleged acts were performed with a reckless disregard or complete indifference to the probable consequences. *Wagner v. Live Nation Motor Sports, Inc.*, 586 F.3d 1237 (10th Cir. 2009). Claimants' conclusory allegations fail this test. Despite receiving the alerts, ADT had little actual knowledge of the danger Frost faced at the time of the fire. *See Messer v. Amway Corp.*, 210 F. Supp. 2d 1217, 1237 (D. Kan. 2002) ("Wantonness refers to the mental attitude of the wrongdoer rather than to a particular act of negligence."). Moreover, nothing about ADT's response indicates reckless disregard or complete indifference. ADT attempted to contact Frost and the next number listed on her account multiples times immediately after receiving the alerts in question. Regardless of whether ADT's failure to then contact emergency services was negligent, this conduct does not rise to the higher bar of wanton or grossly negligent behavior. Accordingly, we refuse to invalidate the terms of the Contract on this basis.

### 3. *Kansas Public Policy*

Next, relying on a Kansas Supreme Court case, *Pfeifer v. Federal Express Corp.*, 304 P.3d 1226 (Kan. 2013), Claimants argue that the contractual one-year suit-limitation provision abbreviates the applicable statute of limitations in a manner contrary to Kansas public policy and therefore is unenforceable. Generally under Kansas law, parties are free to contractually shorten otherwise

applicable statutes of limitations.  *Id.*  This principle recognizes the fact that Kansas public policy favors not interfering with parties' freedom of contract.  *See Marshall v. Kan. Med. Mut. Ins.*, 73 P.3d 120, 128 (Kan. 2003).  It is also warranted in light of the fact that "[s]uit limitation provisions serve a number of legitimate purposes which can ultimately lower costs to consumers."  *B.S.C. Hold. Inc. v. Lexington Ins. Co.*, 625 F. App'x 906, 911 (10th Cir. 2015).

In *Pfeifer*, the Kansas Supreme Court limited parties' freedom to contract in this manner where doing so would violate a "strongly held public policy interest."  *Pfeifer*, 304 P.3d at 1234.  *Pfeifer* involved a suit-limitation provision in an employment contract that restricted the time in which employees could bring retaliatory discharge claims based on the exercise of rights granted under the Kansas Workers Compensation Act.  Under the contract at issue, the generally applicable period of two years was reduced to only six months.  In considering the validity of the suit-limitation provision, the Kansas Supreme Court noted the issue "is lodged squarely between two long-standing public policy interests"—the freedom to contract and the "protections afforded injured workers against retaliatory discharge when exercising statutory workers compensation rights."  *Id.* at 1228.  In recognizing the latter public policy interest, the court looked to Kansas case law discussing "a thoroughly established public policy supporting injured workers' rights to pursue remedies for their on-the-job injuries and

-16-

opposing retaliation against them for exercising their rights." *Id.* at 1232 (citing

*Hysten v. Burlington N. Santa Fe Ry. Co.*, 108 P.3d 437, 444 (Kan. 2004)). The

court also noted that the recognition of the retaliatory discharge tort was essential

to the protection of the statutory rights of the Workers Compensation Act, which,

"exist only because of the legislature's determination that such [rights are] in the

public interest." *Id.* Because it found contractually abbreviating the otherwise

applicable two-year statute of limitations period to six months would have a

"deterrent" effect on the exercise of such rights, the court found the public policy

concerns sufficient to invalidate the contractual suit-limitation provision at issue.

*Id.* at 1232–34.

Claimants argue that a similar conclusion is warranted here because their

"wrongful death, survival and consumer protection claims invoke public policy

concerns of a greater magnitude than the retaliatory discharge claim protected by

the *Pfeifer* court." Aplt. Br. at 28. But Claimants fail to support this conclusory

statement with sufficient evidence to demonstrate a "strongly held public policy

interest" is at stake. *Pfeifer*, 304 P.3d at 1234. With respect to Claimants'

wrongful death claim and survival actions, Claimants point to Kansas case law

recognizing these causes of action. None of these cases, however, explicitly state

a Kansas public policy with respect to the claim at issue, much less one strong

enough to outweigh the policy favoring parties' freedom to contract. *See Byrd v.*

*Wesley Med. Ctr.*, 699 P.2d 459, 468 (Kan. 1985); *Flowers v. Marshall*, 494 P.2d 1184, 1188 (Kan. 1972). We decline to read such Kansas public policy statements into these precedents.

Finally, Claimants suggest that Section 9's suit-limitation provision violates Kansas public policy because their claims stem from statutory authority. While statutory rights reflect the Kansas "legislature's determination that such a right is in the public interest," and thereby provide some evidence of a public policy interest, *see Pfeifer*, 304 P.3d at 1232, we decline to read *Pfeifer* so broadly as to invalidate suit-limitation provisions with respect to all statutory rights. Such a broad reading would contradict *Pfeifer*'s statement that its holding "is limited to the circumstances in which there is a strongly held public policy interest at issue." *Id.* at 1234. Indeed, *Pfeifer* itself affirmed the general proposition that parties are free to shorten applicable statutes of limitations through contracts. *See id.* at 1231.

Accordingly, we hold that the contractual limitations period at issue is neither void or unenforceable as contrary to Kansas public policy.

### C. Contract Applicability

Claimants also contest the Contract's applicability. Even if the Contract is valid, Claimants contend, it does not bind *them*.

With respect to M.F.'s wrongful death claim, Claimants argue that because M.F. is not a third-party beneficiary or in privity with ADT, the Contract does not apply to his claim. Aplt. Br. at 20. But, as the district court explained, the Contract applies because under the Kansas wrongful death statute, M.F.'s claim is derivative of Frost's legal rights. *See* K.S.A. § 60-1901(a). That statute states that M.F. is only permitted to pursue a wrongful death claim "if [Frost] might have maintained the action had [she] lived." *Id*. Because the viability of the claim is conditioned on Frost's legal rights and obligations, the Contract—which affects those rights and obligations—applies to M.F.'s wrongful death claim. *See Mason v. Gerin Corp.*, 647 P.2d 1340, 1345 (Kan. 1982) (describing the decedent's ability to bring an action as the "condition precedent" to a claim under § 60-1901); *see also Salazar v. On the Trails Rentals, Inc.*, 506 F. App'x 709, 713 (10th Cir. 2012) (affirming dismissal of wrongful death claim brought by decedent's surviving family on the basis of the liability-limiting provision in the contract decedent entered into). This holds true irrespective of M.F.'s privity of contract or status as a third-party beneficiary.

With respect to the remaining claims, Claimants contend the Contract is inapplicable because the causes of action constitute independent torts arising outside of the contractual relationship at issue. Under Kansas law, Claimants may simultaneously pursue claims arising in contract and tort. *See Bittel v. Farm*

-19-

*Credit Servs. of Cent. Kan., P.C.A.*, 962 P.2d 491, 497–98 (Kan. 1998). But where parties "abandon their status as legal strangers and define their relationship by contract," their legal duties are dictated by contract, not tort, law. *Ford Motor Credit Co. v. Suburban Ford*, 699 P.2d 992, 998 (Kan. 1985); *see also Isler v. Texas Oil & Gas Corp.*, 749 F.2d 22, 24 (10th Cir. 1984) (stating that "an essential corollary of the concept of bargained-for duties is bargained-for liabilities"). Thus, where a contractual relationship exists, it will bar the assertion of tort claims covering the same subject matter. *See Regal Ware, Inc. v. Vita Craft Corp.*, 653 F. Supp. 2d 1146, 1152 (D. Kan. 2006); *see also Suburban Ford*, 699 P.2d at 998.

Here, Claimants' allegations regarding independent torts committed outside of contractual duties fail under this principle. The Sixth Circuit's opinion in *Spengler v. ADT Security Services, Inc.* is instructive. 505 F.3d 456 (6th Cir. 2007). In *Spengler*, plaintiff entered into a contract with ADT Security Services, Inc. to install and monitor a security alarm at his mother's home. After receiving an alarm, ADT contacted emergency responders. But ADT erred in the address that it gave to ambulance dispatchers, resulting in a sixteen minute delay in the arrival of emergency medical services. Plaintiff brought suit, alleging tort as well as contract liability. The Sixth Circuit affirmed dismissal of the tort claims because the tort theories of liability were subsumed within the scope of the

contract. *See id.* at 457 ("[T]his case sounds in contract and not in tort."). A similar conclusion is warranted here.

Although the Sixth Circuit applied Michigan law in *Spengler*, we detect no meaningful differences between the principles applied there and the Kansas law applicable here. Nor have Claimants put forward any case holding a security services company or similar entity liable in tort for failures to adequately perform monitoring services. *See Valenzuela v. ADT Sec. Servs., Inc.*, 820 F. Supp. 2d 1061, 1070–71 (C.D. Cal.) (noting "plaintiffs have not pointed to, nor has this Court found, a single case in which a court held . . . that an alarm company's failure to notify the relevant parties of a received burglar alarm signal created a duty outside of the contract.").

In sum, Claimants cannot rely on independent tort theories of liability to avoid the terms of the Contract.

### D.  Tolling

Even if enforceable and applicable, Claimants argue the suit-limitation provision should be tolled with respect to M.F.'s claims in light of his minority status.[5] Claimants argue that under Kansas law, M.F. is entitled to bring any of

---

[5] Claimants also argue tolling is warranted due to fraudulent concealment. But fraudulent concealment requires affirmative and intentional conduct aimed at preventing a plaintiff from pursuing a claim. *See Friends Univ. v. W.R. Grace & Co.*, 608 P.2d 936, 941 (Kan. 1980). Claimants fail to allege any conduct on behalf of ADT that involves Claimants and was directed at precluding them from timely bringing suit. Accordingly, this argument fails.

-21-

his claims up until August 15, 2024 because the limitations period should only begin to run once M.F. reaches 18 years of age.  Aplt. Br. at 30 (citing K.S.A. § 60-515).  K.S.A. § 60-515 provides, "if any person entitled to bring an action . . . at the time the cause of action accrued or at any time during the period the statute of limitations is running, is less than 18 years of age . . . such person shall be entitled to bring such action within one year after the person's disability is removed."  K.S.A. § 60-515(a).  Claimants fail to raise any precedent applying this provision to displace a contractually agreed upon limitations provision, and, similar to the district court, we decline to conclude that the Kansas Supreme Court would apply § 60-515(a) in this manner.  Indeed, the text of Section 9 of the Contract is clear in that it precludes the application of tolling provisions, stating, without exception, that any claim must be brought no later "than one year after the date the cause of action for such claim accrued."  App. at 75.

Moreover, with respect to a minor's wrongful death claim, the Kansas Supreme Court in *Mason v. Gerin Corp.*, clarified that it is *decedent's* ability to bring suit that serves as the "condition precedent" for a wrongful death claim. 647 P.2d 1340, 1345 (Kan. 1982).  Because Frost would be unable to bring a claim more than a year after her death, those seeking to bring a wrongful death action are similarly limited.[6]

_____

[6] Although the Kansas Supreme Court in *Frost v. Hardin* held K.S.A. § 60-515 tolled minor's wrongful death claim, that decision pre-dates *Mason v. Gerin*

(continued...)

# III.  Conclusion

We find Section 9 of the Contract valid, enforceable, and controlling with respect to the claims at issue.  Under the plain terms of Section 9, such claims are barred if, as is the case here, they are brought more than a year after the claim accrues.  Accordingly and for the foregoing reasons, we **AFFIRM** the judgment of the district court.

---

[6](...continued)
*Corp*.  *See Frost v. Hardin*, 577 P.2d 1172, 1172 (Kan. 1978).  Moreover, *Frost* dealt with a generally applicable statue of limitations as opposed to a contractually agreed upon limitations period.