No. 47,986

FRANK WILLE d/b/a FRANK WILLE COMPANY and FRANK WILLE'S COLEMAN COMFORT CENTER, *Appellant*, v. SOUTHWESTERN BELL TELEPHONE COMPANY, *Appellee*.

(549 P. 2d 903)

Opinion filed May 8, 1976.

*Charles E. Cole, Jr.,* of Foulston, Siefkin, Powers and Eberhardt, of Wichita, argued the cause, and *Robert C. Foulston* of the same firm was with him on the brief for the appellant.

*Durward D. Dupre,* of Topeka, argued the cause, and *T. Larry Barnes* and *Robert A. Lewis,* both of Topeka, were with him on the brief for the appellee.

The opinion of the court was delivered by

HARMAN, C.: This appeal presents the question whether an advertiser can recover damages for negligence or breach of contract from a telephone company for an omission in the yellow pages of a telephone directory when the contract entered into by the parties limits the company's liability for errors and omissions to an amount equal to the cost of the advertisement. The trial court granted summary judgment for the telephone company and the advertiser has appealed.

The facts, as revealed by the pleadings and appellant's deposition, are undisputed. Appellant Frank Wille operates a heating and air conditioning sales and service business in Wichita under the trade names, Frank Wille Company and Frank Wille's Coleman Comfort Center, and for the thirteen years prior to 1974 had purchased some form of yellow page listing for his business in the telephone directory published by appellee Southwestern Bell Telephone Company for the Wichita district.

In February, 1974, a sales representative for Bell contacted appellant to discuss his yellow page listings in the directory to be published in July, 1974. As a result appellant agreed to purchase certain listings for both of his business trade names. Appellant

received a copy of the written contract which was executed. At this time appellant's business was located at 1633 East Second street and his business phone numbers were 265-2609 and 265-7231.

In April, 1974, appellant contacted Bell regarding changing his telephone service to a new business location at 1909 East Central street and expanding his service through additional rotary or sequential telephone numbers. Appellant was advised numbers were not available to him to expand his present numbers sequentially. Hence he decided to subscribe to a new number, 265-4685, in order to have additional telephone lines available for his business in sequential numbers. As part of this decision appellant cancelled the phone service to him under the number 265-7231. However, because his other telephone number, 265-2609, was displayed on some equipment previously sold, appellant decided to retain that service in the yellow pages but not in the white.

In July, 1974, Bell distributed the new directory. Certain of appellant's yellow page listings under various headings for the business name Frank Wille's Coleman Comfort Center and telephone number 265-2609 were omitted. The yellow page advertising sold in February, 1974, applicable to the Frank Wille Company, phone number 265-7231, appeared in the directory. That advertising listed appellant's new address, 1909 East Central, and the new telephone number, 265-4685. Upon learning of the omission appellant began advertising his business on local television stations and in alternate forms of advertising, with total expenditures being between four and five thousand dollars.

Appellant was never billed nor has he paid for the omitted listings. The written contract between the parties was subject to thirteen terms and conditions which were set out on the back of the contract. The fourth paragraph of those conditions provided:

"The applicant agrees that the Telephone Company shall not be liable for errors in or omissions of the directory advertising beyond the amount paid for the directory advertising omitted, or in which errors occur, for the issue life of the directory involved."

Appellant filed this action October 24, 1974, alleging breach of contract and negligence by Bell in the omission. Damages were sought in the amount of $9,990 for lost profits and expense for alternative advertising.

The trial court entered summary judgment for Bell because of the contractual limitation of liability for errors and omissions and the matter is now here for review.

Appellant contends the exculpatory clause upon which appellee relies is contrary to public policy and should not be enforced. He asserts unconscionability of contract in two respects: The parties' unequal bargaining position and the form of the contract and the circumstances of its execution.

American courts have traditionally taken the view that competent adults may make contracts on their own terms, provided they are neither illegal nor contrary to public policy, and that in the absence of fraud, mistake or duress a party who has fairly and voluntarily entered into such a contract is bound thereby, notwithstanding it was unwise or disadvantageous to him (Anno.: Sales— "Unconscionability", 18 ALR 3d 1305, § 2, p. 1307). Gradually, however, this principle of freedom of contract has been qualified by the courts as they were confronted by contracts so one-sided that no fair minded person would view them as just or tolerable. An early definition of unconscionability was provided by Lord Chancellor Hardwicke, in the case of *Chesterfield (Earl of) v. Janssen*, 2 Ves. Sen. 125, 28 Eng. Rep. 82 (1750):

". . . [a contract] such as no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other; which are unequitable and unconscientious bargains; and of such even the common law has taken notice. . . ." (p. 100.) (Discussed in *Hume v. United States*, 132 U. S. 406, 411-413, 33 L. ed. 393, 10 S. Ct. 134 [1889].)

The doctrine was first applied by early equity and some common law courts in cases which approached clear fraud. (See a discussion of these cases in the Anno.: 18 ALR 3d, § 3, p. 1309.)

The doctrine, however, received its greatest impetus when it was enacted as a part of the Uniform Commercial Code. K. S. A. 84-2-302 provides in part that:

"(1) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result. . . ."

(The doctrine of unconscionability in the area of private contract has come into our Kansas law by three other recent enactments: K. S. A. 16a-5-108, Uniform Consumer Credit Code; K. S. A. 1975 Supp. 50-627, Consumer Protection Act; and K. S. A. 1975 Supp. 58-2544, Residential Landlord and Tenant Act.)

Although the UCC's application is primarily limited to contracts for the present or future sale of goods (K. S. A. 84-2-102; 84-2-105),

many courts have extended the statute by analogy into other areas of the law or have used the doctrine as an alternative basis for their holdings (Leff, "Unconscionability and the Code—The Emperor's New Clause", 115 U. Pa. L. Rev. 485). The UCC neither defines the concept of unconscionability nor provides the elements or perimeters of the doctrine. Perhaps this was the real intent of the drafters of the code. To define the doctrine is to limit its application, and to limit its application is to defeat its purpose. (Note, "The Doctrine of Unconscionability", 19 Maine L. Rev. 81, 85.)

The comment to K. S. A. 84-2-302 sheds some light on the drafters' intent. It provides in part:

". . . The basic test is whether, in the light of the general commercial background and the commercial needs of the particular trade or case, the clauses involved are so one-sided as to be unconscionable under the circumstances existing at the time of the making of the contract. . . . The principle is one of the prevention of oppression and unfair surprise . . . and not of disturbance of allocation of risks because of superior bargaining power. . . ."

One commentator has elaborated on the two types of situations which UCC is designed to deal with:

". . . One type of situation is that involving unfair surprise: where there has actually been no assent to the terms of the contract. Contracts involving unfair surprise are sim'lar to contracts of adhesion. Most often these contracts involve a party whose circumstances, perhaps his inexperience or ignorance, when compared with the circumstances of the other party, make his knowing assent to the fine print terms fictional. Courts have often found in these circumstances an absence of a meaningful bargain. [See *Henningsen v. Bloomfield Motors, Inc.*, 32 N. J. 358, 161 A. 2d 69 (1960).]

"The other situation is that involving oppression: where, although there has been actual assent, the agreement, surrounding facts, and relative bargaining positions of the parties indicate the possibility of gross over-reaching on the part of either party. Oppression and economic duress in a contract seem to be inseparably linked to an inequality of bargaining power. The economic position of the parties is such that one becomes vulnerable to a grossly unequal bargain." (19 Maine L. Rev., *supra*, pp. 82-83.)

(*Accord:* Spanogle, "Analyzing Unconscionability Problems", 117 U. Pa. L. Rev. 931.)

Although the doctrine of unconscionability is difficult to define precisely courts have identified a number of factors or elements as aids for determining its applicability to a given set of facts. These factors include: (1) The use of printed form or boilerplate contracts drawn skillfully by the party in the strongest economic position, which establish industry wide standards offered on a take it or

leave it basis to the party in a weaker economic position (*Henningsen v. Bloomfield Motors, Inc.,* supra; *Campbell Soup Co. v. Wentz,* 172 F. 2d 80); (2) a significant cost-price disparity or excessive price; (3) a denial of basic rights and remedies to a buyer of consumer goods (*Williams v. Walker-Thomas Furniture Company,* 350 F. 2d 445; 18 ALR 3d 1305); (4) the inclusion of penalty clauses; (5) the circumstances surrounding the execution of the contract, including its commercial setting, its purpose and actual effect (*In re Elkins-Dell Manufacturing Company,* 253 F. Supp. 864, [E. D. Pa.]); (6) the hiding of clauses which are disadvantageous to one party in a mass of fine print trivia or in places which are inconspicuous to the party signing the contract (*Henningsen v. Bloomfield Motors, Inc.,* supra); (7) phrasing clauses in language that is incomprehensible to a layman or that divert his attention from the problems raised by them or the rights given up through them; (8) an overall imbalance in the obligations and rights imposed by the bargain; (9) exploitation of the underprivileged, unsophisticated, uneducated and the illiterate (*Williams v. Walker-Thomas Furniture Company,* supra); and (10) inequality of bargaining or economic power. (See also Ellinghaus, "In Defense of Unconscionability", 78 Yale L. J. 757; 1 Anderson on the UCC, § 2-302, and cases cited therein.)

Important to this case is the concept of inequality of bargaining power. The UCC does not require that there be complete equality of bargaining power or that the agreement be equally beneficial to both parties (1 Anderson, § 2-302:11, p. 401). As has been pointed out:

"[The language of the comment to § 2-302 means] . . . that *mere* disparity of bargaining strength, *without more,* is not enough to make out a case of unconscionability. Just because the contract I signed was proffered to me by Almighty Monopoly Incorporated does not mean that I may subsequently argue exemption from any or all obligation: at the very least, some element of deception or substantive unfairness must presumably be shown." (78 Yale L. J., *supra,* pp. 766-767.)

The cases seem to support the view that there must be additional factors such as deceptive bargaining conduct as well as unequal bargaining power to render the contract between the parties unconscionable. In summary, the doctrine of unconscionability is used by the courts to police the excesses of certain parties who abuse their right to contract freely. It is directed against one-sided, oppressive and unfairly surprising contracts, and not against the con-

sequences *per se* of uneven bargaining power or even a simple old-fashioned bad bargain (1 Anderson, *supra,* § 2-302.11, p. 401).

The most recent application of the common law doctrine of unconsci.mability in Kansas occurred in *Steele v. J. I. Case Co.,* 197 Kan. 554, 419 P. 2d 902. There the plaintiff, a large scale wheat and barley farmer, purchased from defendant three combines which were delivered shortly before harvest. The sales were evidenced by form contracts furnished by defendant. According to the terms on the reverse side of the contract, defendant warranted its equipment to be properly made and capable of performing the work for which it was designed under ordinary conditions. The contract further provided that should defendant's product fail to operate as warranted, written notice of the problem should be given to defendant's dealer. If the dealer failed to correct the deficiencies, then defendant was to be given a reasonable time to remedy the defect or advise its local dealer of the appropriate remedy. In the event, however, defendant was not able to remedy the defect, then, according to the contract terms, defendant had the option either of replacing the equipment or rescinding the sales contract by returning the purchase price. The contract excluded all other express, implied or statutory warranties, and limited defendant's liability for any breach of the contract's express warranties to returning the purchase price of its product.

Immediately after the combines were delivered to plaintiff, he began having numerous difficulties. Complaints were made of these deficiencies, and several attempts were undertaken by defendant to correct them. After repeated attempts by defendant to remedy the defects failed, plaintiff made several demands for return of the purchase price. Each of plaintiff's demands was refused. Thereafter, plaintiff agreed to trade in the defective combines, and pay the difference for three new 1961 Case combines, which were subsequently delivered to him.

Plaintiff brought suit to recover for damages to his crops caused by the delay incident to defendant's numerous attempts to correct the deficiencies in the combines initially purchased. The matter was tried to a jury which returned a verdict in plaintiff's favor. Judgment was entered on that verdict, and defendant appealed.

The trial court instructed the jury to disregard the contractual proviso limiting defendant's liability to any breach of its warranty to the return of the purchase price. Defendant Case maintained the broad accepted freedom of contract policy should control. In

affirming the judgment we noted the disparity of position in the contracting parties in that the plaintiff had no part in the preparation of the printed form contract, the plaintiff lacked knowledge of the exculpatory clause and further that defendant knew of the special business needs of plaintiff and their urgency and despite this knowledge was dilatory in making amends either by timely repair of the combines, their replacement or return of the purchase price. Within this framework, we held the exculpatory clause in the contract was void, saying:

"Liability for consequential or special damages may be limited or excluded by the terms of a warranty unless, under all the surrounding facts and circumstances, the limitation or exclusion would prove to be inequitable." (Syl. para. 4.)

Clearly there were other factors present in *Steele* besides mere disparity of bargaining power which resulted in the ruling. Also to be noted is the fact the contract called for equipment to be used for a specific purpose—harvesting grain—the breach of which would cause the farmer to lose everything he had invested in that grain crop. This latter factor presents a different situation from that of the advertiser who is no worse off by reason of an omission of his ad in the yellow pages than if he had made no contract at all.

We have never dealt with contractual limitation of liability for errors and omissions in the yellow pages directory but many courts have. One case on the subject, relied upon heavily by appellant, is *Allen v. Mich. Bell Telephone Co.*, 18 Mich. App. 632, 171 N. W. 2d 689. In a factual situation essentially identical to that here the court declined to give effect to the limitation of liability clause principally on the basis of unconscionability by reason of the inequal positions of the parties in bargaining for services for which no realistic alternative was available.

All other courts which have considered the matter, so far as we can ascertain, have reached a contrary conclusion, that is, a telephone company may by contract limit the amount of its liability resulting from omissions and mistakes in the yellow pages directory so long as it does not seek immunity from gross negligence or wilful misconduct (see *Gas House, Inc. v. Southern Bell Tel. & Tel. Co.*, 289 N. C. 175, 221 S. E. 2d 499, and cases from fourteen other jurisdictions cited therein [221 S. E. 2d 504]; also Anno.: Telephone Directory—Mistake—Omission, 92 ALR 2d 919).

In *Gas House, Inc.* the North Carolina supreme court had this to say on the subject:

"The general principle governing the validity of contracts against the charge that they are unreasonable is thus stated in 14 Williston on Contracts, 3d Ed., § 1632:

"'People should be entitled to contract on their own terms without the indulgence of paternalism by courts in the alleviation of one side or another from the effects of a bad bargain. Also, they should be permitted to enter into contracts that actually may be unreasonable or which may lead to hardship on one side. It is only where it turns out that one side or the other is to be penalized by the enforcement of the terms of a contract so unconscionable that no decent, fairminded person would view the ensuing result without being possessed of a profound sense of injustice, that equity will deny the use of its good offices in the enforcement of such unconscionability.' '

"The leading case on the question of the validity of such a Limitation of Liability Clause in a contract for telephone directory advertising is *McTighe v. New England Tel. & Tel. Co.*, supra where Circuit Judge Medina, speaking for the Court of Appeals for the Second Circuit, said:

"'The publication of the classified directory [i. e., the 'yellow pages'] * * * is wholly a matter of private contract and contracts relating thereto are not required to be filed with the Public Service Commission [of Vermont] *which has no jurisdiction except over matters relating to the public utility* services rendered by the company and the rates relative thereto.

. . . . . . . . . .

"'True it is that the courts will scrutinize with care clauses exonerating public utility companies, such as railroads, telegraph and telephone companies and others, from liability for the consequences of their own negligence, *with reference to the public services rendered by them*. The fact that the member of the public patronizing such public utility companies must take the contract proffered by the company or forego using the service has enabled the courts to inquire into the reasonableness of the type of clause now under discussion and by this test the clause applicable to the alphabetical [i. e., white pages] directory would as a matter of contract law be considered unreasonable and unenforceable. But the principle which enables courts to strike down and condemn clauses affecting the performance by the company of its functions as a public utility is limited to the area in which the public services are rendered and has no application whatever to the domain in which the public utility may freely contract in its private capacity. The obtaining of the services of the public utility by way of transportation or communications or providing gas or electricity is quite apart from the leases, advertising contracts and a host of other miscellaneous agreements commonly made by members of the public with public utility companies. If there be some disparity in the bargaining power of the contracting parties it is no more than may be found generally to exist; and the courts follow the general rule that the parties are free to contract according to their own judgment and the reasonableness of their engagements will not be entered into.' (Emphasis added.)

"The reason for the rule that a common carrier, or other public utility, may not contract away its liability for negligence in the performance of its public utility service and may not claim the benefit of an unreasonable con-

tract limiting the amount of its liability therefor, is that every member of the public is entitled by law to demand such service with full liability as a reasonable rate therefor. For the company to refuse to serve unless the customer agrees to release it from liability for its negligent performance of its obligation to serve would be a denial of this legal right in the would-be customer. Thus, such a contract limiting the liability of the carrier, or other public utility, unless reasonable, is contrary to public policy and invalid. This limitation upon the right of the common carrier, or other public utility, to contract applies, however, only to its undertakings to render services which fall within its public service business. For example, a telephone company leasing office space to a tenant, or an electric power company selling an electric stove, is free to contract with reference to those matters as is any other owner of a building or dealer in electric stoves. The business of carrying advertisements in the yellow pages of its directory is not part of a telephone company's public utility business.

"The inequality of bargaining power between the telephone company and the businessman desiring to advertise in the yellow pages of the directory is more apparent than real. It is not different from that which exists in any other case in which a potential seller is the only supplier of the particular article or service desired. There are many other modes of advertising to which the businessman may turn if the contract offered him by the telephone company is not attractive.

"We find in this record no basis for a conclusion that the application of the Limitation of Liability Clause could lead to a result so unreasonable as to shock the conscience. In the absence of most exceptional circumstances, which do not appear in this record, the insertion of a 'Yellow Page' advertisement under the wrong classification heading will not produce a different result from that which would follow a complete omission of the advertisement from the directory. It would be virtually, if not completely, impossible to determine what portion of the business done by an advertiser is attributable to its use of 'Yellow Page' advertising. There are many factors which enter into periodic fluctuations in the volume of business done by a seller of goods. The purpose of the Limitation of Liability Clause is to protect the telephone company from the danger of verdicts primarily speculative in amount. This is not an unreasonable objective. In this respect, the telephone company is not in a different position from the local newspaper, radio or television station, or other advertising media." (221 S. E. 2d 504-505.)

Appellant here attacks the limitation of liability clause in several respects. He says it was buried in a number of other terms and conditions of the same size print on the reverse side of the contract from where the parties sign and that the particular proviso was not effectively brought home to him at the time he signed. He in effect asserts unfair surprise.

The front page of the contract provides space for setting out the name or style of the business and other essential data in connection with the listings covered. In two different places attention is directed to the terms and conditions contained on the reverse

side of the contract, one at the top of the form and the other in block letters immediately above the signature line for the purchaser. The latter states:

"THE APPLICANT HEREBY REQUESTS THE TELEPHONE COMPANY TO INSERT THE ABOVE ITEMS OF ADVERTISING IN THE ABOVE NAMED DIRECTORY SUBJECT TO THE TERMS AND CONDITIONS ON THE REVERSE SIDE HEREOF."

The terms and conditions on the reverse side are set out in clearly legible type in thirteen numbered paragraphs, and are written in common words. It cannot be said they are one-sided. Some are for the protection of and inure to the benefit of the advertiser. The language of the challenged paragraph 4 is not couched in confusing terms designed to capitalize on carelessness but is clear and concise. Appellant did testify he had not attempted to read the various terms and conditions listed on the reverse side of the contract. He was an experienced businessman and for at least thirteen years had used the yellow pages. In his business it is reasonable to assume he as seller and serviceman had become familiar with printed form contracts that are frequently used in connection with the sale and servicing of heating and air conditioning equipment and their attendant warranties and limitations of liability. And, as pointed out in *Gas House, Inc. v. Southern Bell Tel. & Tel. Co.*, supra, and in several other cases cited therein, yellow pages are not a unique or monopolistic form of advertising. Numerous alternative forms exist.

There is no indication here either of gross negligence or wilful or wanton conduct in the omission of appellant's listing and he asserts nothing beyond simple neglect. It appears the omissions arose from clerical error in the handling of appellant's request for changes after the original contract.

In *Steele v. J. I. Case Co.*, supra, we recognized that liability for consequential damages may be limited or excluded contractually unless under all the surrounding facts and circumstances, the limitation or exclusion would be inequitable (Syl. para. 4). Each case of this type must necessarily rest upon its own facts but after examining the terms of the contract, the manner of its execution and the knowledge and experience of appellant we think the contract was neither inequitable nor unconscionable so as to deny its enforcement.

Our conclusion that the trial court ruled correctly is not affected by anything said in *Milling Co. v. Postal Telegraph Co.*, 101 Kan.

307, 166 Pac. 493. There this court held that a telegraph company could not by contract limit its liability for negligence in transmitting telegraphic messages. The contract limitation was sought to be applied to the public duty of the company—the transmission of messages—and not to a matter of private contract in an area of private service as here. The court did recognize that not all contracts against liability are void.

The judgment is affirmed.

APPROVED BY THE COURT.