**JOHN DEERE LEASING COMPANY, Plaintiff,**

v.

**Reuben D. BLUBAUGH, Defendant.**

**No. 85–6115–K.**

United States District Court, D. Kansas.

June 24, 1986.

Paul S. McCausland, Wichita, Kan., for plaintiff.

Brian S. Frost, Topeka, Kan., for defendant.

## MEMORANDUM AND ORDER

PATRICK F. KELLY, District Judge.

In this action, plaintiff John Deere Leasing Company is seeking to recover a deficiency arising from the repossession and sale of farm equipment pursuant to a lease between plaintiff and defendant Reuben D. Blubaugh. Under the express terms of the lease, John Deere Leasing is entitled to $12,054.43 as deficiency from the sale of the equipment. Defendant Blubaugh contests his liability on the ground that the provision in the lease providing for the deficiency was unconscionable and is therefore unenforceable. An evidentiary hearing was held on June 17, 1986, and after considering the testimony, exhibits and briefs, the court is prepared to rule.

### Findings of Fact

On June 30, 1982, defendant entered into an agreement with plaintiff for the lease of a Model 6620 combine. Although defendant could have purchased the combine and financed it through John Deere or a third party lender, certain tax advantages were available to defendant by leasing. Specifically, Blubaugh was able to deduct the annual rental payments from his income. Also, the lease arrangement enabled John Deere Leasing to use the combine as an investment tax credit.

The lease agreement provided that Blubaugh would pay four annual rentals of $15,991.37, beginning July 1, 1983, and at the end of the lease term would have an option to purchase the combine for $27,191.25.

The definition of "default" and the lessor's remedies in case of default were stated on the back of the agreement:

9. DEFAULT

Lessee shall be in default under the Lease if any of the following events occur:

9.1 Lessee fails to make any lease payments or pay other sums due hereun-

der within ten (10) days after the same shall become due.

\* \* \* \* \* \*

10. REMEDIES OF LESSOR

Upon default of Lessee, Lessor may, without notice to or demand upon Lessee, exercise any one or more of the following remedies.

10.1 Declare all unpaid rent for the full term of this Lease immediately due and payable, together with all expenses of collection by suit or otherwise, including reasonable attorney's fees.

10.2 Take possession of the Equipment (which Lessee shall surrender on demand).

10.3 Sell the Equipment or any portion thereof at public or private sale and without demand on Lessee for payment or notice of intention to sell, retain the proceeds of any such sale, and terminate this lease as of the date of such sale. If the proceeds, after deducting all costs and expenses incurred in connection with the recovery, repair, storage and sale of the Equipment and after deducting any lease payments and other obligations of Lessee due and unpaid hereunder on the date of the sale, including interest on past due lease payments, are less than the Termination Value on the date of the sale, Lessee shall immediately pay Lessor the difference.

\* \* \* \* \* \*

17. TERMINATION VALUE

Termination Value, as used in this Lease, shall be a sum equal to: (a) the total of all lease payments (excluding any sales tax included in such lease payments) which are not yet due on the date of the loss under Section 7 or the date of sale under Sections 8 or 10; (b) plus the Option Purchase Price shown on the front hereof; (c) minus the unearned finance income component included in the lease payments not yet due on such date calculated using the "Sum of the Monthly Balances" method and treating any federal income tax investment tax credit

retained by the Lessor as a payment; (d) plus the difference between the federal income tax investment tax credit which could have been retained by Lessor if Lessee leased the Equipment for the full term of this Lease and the federal income tax investment tax credit which is actually retained by the Lessor. Upon request, Lessor will advise Lessee of the amount of the Termination Value to be used in computing Lessee's obligations under Section 7, 8 or 10.

The provisions on the back side of the lease are in very light-colored, fine print. The paper on which the lease is drawn is extremely lightweight, which allows the darker print on the front page to show through to the back, making it difficult to see the fine print. Defendant testified that while he read and signed the front of the lease, he did not read the back. His understanding was that he had entered a basic "lease with an option to purchase" arrangement. He had leased equipment from John Deere on at least one previous occasion. He did not expect that upon default he would be liable for the purchase price. This potential liability was not explained to him by anyone from John Deere Leasing.

Defendant paid $30,939.16 toward the first two rental payments. He made no further payments. It is undisputed that he is in default under the terms of the lease. After declaring defendant in default, John Deere Leasing repossessed the combine and later sold it. The parties have stipulated the defendant received notice of the sale and that it was conducted in a commercially reasonable manner. The combine sold for $42,000.00.

On the date of the sale, the "termination value" of the lease was $54,054.43. This figure was derived from adding the remaining lease payments plus interest ($31,163.24), the option to purchase price ($27,191.25), the investment tax credits for the remainder of the lease ($4,648.08), and then subtracting the unearned finance charges ($9,222.23), and finally adding the past due interest ($274.09).

John Deere Leasing claims that under the express terms of the lease defendant owes $12,054.43, which is the difference between the termination value ($54,054.43) and the price for which the combine actually sold ($42,000.00). Defendant does not dispute the validity of the figures, however, he argues the lease provisions in question were "unconscionable" due to the illegibility and convolution of the terms, the discrepancy in bargaining power, the "adhesion" nature of the lease, and the addition of the "option price" into the "termination value" which creates an unenforceable penalty for breach.

John Deere Leasing contends that whether or not defendant read or understood the lease, he had a duty to ascertain its meaning, and, having failed to do so, is bound by its terms. John Deere Leasing further argues the lease is not "unconscionable" because the definition of "termination value" is clear and unambiguous, and the inclusion of the option price in the formula simply allows John Deere Leasing to recover the benefit of its bargain.

Before turning to the discussion of the legal principles which are controlling in this case, the court makes the following observations. The terms in question herein are on the back of the lease, and are written in such fine, light print as to be nearly illegible. In fact, the print is so light that neither party was able to obtain a satisfactory photocopy. Consequently, the court did not read the lease until it received the original into evidence at the hearing. The court was then required to use a magnifying glass to read the reverse side. The court found the wording to be unreasonably complex. It is as if the scrivener intended to conceal the thrust of the agreement in the convoluted language and fine print. The term which provides for the addition of the option price to the lessee's liability on default is a term quite outside the norm. John Deere's contention that the defendant had a duty to ascertain the meaning of all terms, in the face of the near concealment of this unusually harsh remedy, is inexcusably inadequate and need not be tolerated by any court. This court is surprised that a reputable company such as Deere would stoop to this.

*Conclusions of Law*

By stipulation of the parties, this court has jurisdiction over this matter and will apply Kansas law.

■ A general principle of contract law is that competent parties may make contracts on their own terms, provided such contracts are neither illegal nor contrary to public policy, and in the absence of fraud, mistake or duress, a party who has entered into such contract is bound thereby. *Squires v. Woodbury,* 5 Kan.App.2d 596, 598, 621 P.2d 443 (1981). This rule applies regardless of a party's failure to read the contract. *L.R. Foy Const. Co., Inc. v. Dauley,* 547 F.Supp. 166 (D.Kan.1982); *Washington v. Claasen,* 218 Kan. 577, 545 P.2d 387 (1987). The rule even applies when the contract turns out to be disadvantageous to the complaining party. *Willie v. Southwestern Bell Tel. Co.,* 219 Kan. 755, 757, 549 P.2d 903 (1976). However, the rule has been qualified by the doctrine of unconscionability. Although the doctrine of unconscionability existed at common law, it received its greatest impetus when it was enacted as part of the Uniform Commercial Code. K.S.A. 84–2–302(1) provides:

> If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

In *Wille v. Southwestern Bell,* 219 Kan. at 757, 549 P.2d 903, the Kansas Supreme Court noted that the doctrine of unconscionability in the area of private contracts came into Kansas law by enactment of the UCC, along with K.S.A. 16a–5–108 (Uniform Consumer Credit Code); K.S.A. 50–627 (Consumer Protection Act); and K.S.A. 58–2544 (Residential Landlord and Tenant Act).

The contract in the case at bar is a lease agreement. The UCC's application is primarily limited to contracts for the sale of goods. However, the unconscionability doctrine of the UCC has often been extended by analogy to other areas of the law. *See Wille v. Southwestern Bell,* 219 Kan. at 758, 549 P.2d at 903 (sale of yellow pages advertising); *Estate of Link v. Wirtz,* 7 Kan.App.2d 186 at 188, 638 P.2d at 985 (real estate lease); *Atkinson v. Orkin Exterminating Co. Inc.,* 5 Kan.App.2d 739, 625 P.2d 505, *aff'd* 230 Kan. 277, 634 P.2d 1071 (1981) (contract to treat consumer's home for termites). Similarly, it may be extended to a case, such as the one herein, involving a lease of farm equipment.

The term "unconscionability" is not defined in the UCC. As the Supreme Court in *Wille* observed:

> The UCC neither defines the concept of unconscionability nor provides the elements or perimeters of the doctrine. Perhaps this was the real intent of the drafters of the code. To define the doctrine is to limit its application, and to limit its application is to defeat its purpose.

219 Kan. at 758, 549 P.2d 903.

In an attempt to reach a workable definition, the *Wille* court enumerated 10 elements or factors to aid courts in determining whether a particular contract in a given situation is "unconscionable" (the factors pertinent to the case at bar are underlined):

> (1) *The use of printed form or boilerplate contracts drawn skillfully by the party in the strongest economic position, which establish industry-wide standards offered on a take it or leave it basis to the party in a weaker economic position* ... (2) a significant cost-price disparity or excessive price; (3) a denial of basic rights and remedies to the buyer of consumer goods ... (4) *the inclusion of penalty clauses;* (5) *the circumstances surrounding the execution of the contract, including its commercial setting, its purpose and actual effect* ... (6) *the hiding of clauses which are disadvantageous to one party in a mass of fine print trivia or in places which are inconspicuous to the party*

*signing the contract ...* (7) *phrasing clauses in language that is incomprehensible to a layman or that divert his attention from the problems raised by them or the rights given up through them;* (8) an overall imbalance in the obligations and rights imposed by the bargain; (9) *exploitation of the* underprivileged, *unsophisticated,* uneducated and the illiterate *...* and (10) *inequality of bargaining or economic power.*

219 Kan. at 758–59, 549 P.2d 903 (all cites omitted).

Clearly, each "unconscionability" case must rest upon its own facts. In *Wille* the court found the only factor present was "inequality of bargaining power." Although plaintiff argued the limitation of liability clause was "buried" within other terms, the court found the clause was clearly legible and written in common words, and that its meaning was clear and concise. The court concluded the mere disparity of bargaining strength *without more* is not enough to support a finding of unconscionability:

> The cases seem to support the view that there must be additional factors such as deceptive bargaining conduct as well as unequal bargaining power to render the contract between parties unconscionable ... [T]he doctrine of unconscionability is used by the courts to police the excesses of certain parties who abuse their right to contract freely. It is directed against onesided, oppressive and unfairly surprising contracts, and not against the consequences *per se* of uneven bargaining power or even a simple old-fashioned bad bargain.

This is not such a case as *Wille* where the only factor tending to show unconscionability was the inequality in bargaining power. In this case, not only was the lessor's remedy on default unduly harsh and one-sided, the term itself was buried, indecipherable, and the contract was in the nature of an "adhesion" contract. It is apparent to this court that the term John Deere Leasing seeks to enforce is just the kind of term that UCC 2–302 was designed to operate against.

Other courts, in attempting to define "unconscionability" under UCC 2–302, have distinguished between "procedural" and "substantive" unconscionability, while still considering the same factors enumerated by the *Wille* court. An illustrative case of the procedural/substantive distinction is *Bank of Indiana, N.A. v. Holyfield,* 476 F.Supp. 104, 109–10 (S.D.Miss.1979), wherein the court stated:

> The indicators of procedural unconscionability generally fall into two areas: (1) lack of knowledge, and (2) lack of voluntariness. A lack of knowledge is demonstrated by a lack of understanding of the contract terms arising from inconspicuous print or the use of complex, legalistic language, ... disparity in sophistication of parties, ... and lack of opportunity to study the contract and inquire about contract terms, ... A lack of voluntariness is demonstrated in contracts of adhesion when there is a great imbalance in the parties' relative bargaining power, the stronger party's terms are unnegotiable, and the weaker party is prevented by market factors, timing or other pressures from being able to contract with another party on more favorable terms or to refrain from contracting at all.
>
> . . . . .
>
> Substantive unconscionability is found when the terms of the contract are of such an oppressive character as to be unconscionable. It is present when there is a one-sided agreement whereby one party is deprived of all the benefits of the agreement or left without a remedy for another party's nonperformance or breach, ... a large disparity between the cost and price or a price far in excess of that prevailing in the market price, ... or terms which bear no reasonable relationship to business risks assumed by the parties, ...
>
> All of these concepts are applicable to leases in particular and all contracts in general....

(All citations omitted.) *See also Hahn v. Ford Motor Co., Inc.,* 434 N.E.2d 943 (Ind. App.1982); *A & M Produce Co. v. FMC*

*Corp.*, 135 Cal.App.3d 473, 186 Cal.Rptr 114 (1982).

Courts utilizing the procedural/substantive distinction find the presence of *either* type of unconscionability enables a court to use its discretion to refuse to enforce the entire contract or a particular provision under 2–302.

In the case at bar, *both* procedural and substantive unconscionability are present. First of all, the lease was procedurally unconscionable because defendant agreed to terms of which he had no knowledge, and his agreement, under the circumstances, was not "voluntary". While it is true the defendant failed to read the back of the lease, he probably did not read it because he did not see it. On the first try here the court did not! Moreover, the court is convinced that even if he had read it, he would not have understood it. The lease was preprinted and so complex by virtue of its legalistic language that a party with no training in law or finance could not possibly decipher the potential for disadvantage. As previously noted, the term in question was in minute print on the back of the lease, and was in such light grey type as to be illegible. The definition of "termination value" was *not* next to the section on "lessor's remedies" but was hidden behind a mass of additional terms.

Further, there was clearly a "disparity in sophistication" between John Deere Leasing and the defendant, a farmer. Undoubtedly the defendant detrimentally relied on John Deere Leasing's superior knowledge. Therefore, defendant lacked knowledge of his risk of liability when he signed the lease.

Additionally, the surrounding circumstances indicate defendant's agreement to the detrimental term was not voluntary. The lease agreement was an "adhesion" contract in that it was obviously drafted by John Deere Leasing for its benefit and presented to defendant in a manner which did not leave room for negotiation of its terms. The "lease-type" arrangement was admittedly advantageous to defendant for tax purposes. If defendant wanted to lease the combine, he had to do so through John Deere Leasing. Thus, he was presented with a John Deere lease on a "take it or leave it" basis.

A further indicator of defendant's lack of voluntariness is demonstrated by the inequality in bargaining power. John Deere Leasing argues defendant is in the "business of farming" so this was a commercial, not a consumer, transaction. The court is not convinced. Clearly the farmer was not of equal bargaining strength with John Deere Leasing. Notably, the Kansas Consumer Protection Act treats "sole proprietors"—such as farmers—as "consumers". K.S.A. 50–624(b). The court is convinced that a farmer is more akin to a consumer than to a commercial party. John Deere Leasing was clearly in superior bargaining position.

Because defendant lacked knowledge and voluntariness, the contract was procedurally unconscionable.

■ The clause was also substantively unconscionable in that it exacted a penalty on defendant for terminating the lease. It is well settled under Kansas law that parties to a contract may stipulate to the amount of damages for breach of the contract, if the stipulation is determined to be a liquidated damages clause rather than a penalty. *U.S.D. No. 315 v. DeWerff*, 6 Kan.App.2d 77, 79, 626 P.2d 1206 (1981). A stipulation for damages upon a future breach of contract is valid as a liquidated damages clause if the set amount is determined to be reasonable and the amount of damages is difficult to ascertain. *White Lakes Shopping Center, Inc. v. Jefferson Standard Life Ins. Co.*, 208 Kan. 121, 126–28, 490 P.2d 609 (1971). The distinction between a liquidated damages clause and one for penalty is that a penalty is to secure performance, while a liquidated damages provision is for payment of a sum in lieu of performance. *U.S.D. No. 315*, 6 Kan.App.2d at 79, 626 P.2d 1206. A penalty provision is unconscionable as a matter of law. *See Leasing Service Corp. v. Justice*, 673 F.2d 70, 73 (2d Cir.1982).

In this case, the liquidated damages clause (lessor's remedies) allowed the les-

sor to add the "purchase option" amount to the rental deficiency, and then to set this amount off against the sale proceeds. Under this formula, John Deere Leasing is awarded damages for the breach of the purchase option. The problem with this is that defendant never accepted the option— that is, he had never contracted to purchase the combine. If he had accepted the option, a valid and binding contract of purchase would have come into existence. Defendant would then be liable for damages. Here, however, no binding contract of sale existed. The Eleventh Circuit Court of Appeals was met with an identical situation in *Leasing Service Corp. v. River City Const., Inc.*, 743 F.2d 871 (11th Cir.1984). In finding that the addition of the purchase option into the liquidated damages was an invalid penalty, the court observed:

> The purchase option is merely an offer by the seller to hold an offer open to the potential buyer for a certain time. Until [defendant] accepted the offer, there was no valid, enforceable agreement. [Citation omitted.] If the offer is not accepted, the optioner is under no obligation to convey the property, and the optionee is under no obligation to buy. [Citation omitted.] At the time of breach, the lessor could not have exercised this option, even if it wished, since the option by its terms became effective only at the end of the lease's term. There is no actual contract to purchase....
>
> Damages cannot be awarded upon a contract not yet in existence. Damages therefore must be limited to losses arising out of the termination of the actual rental. The purchase option never came into force and was never exercised. The damages for the breach of the "purchase option", ... must therefore be stricken from the award.

743 F.2d at 879–80.

Likewise, in this case, allowing plaintiff to recoup the option to purchase price from defendant is a penalty in that it is tantamount to compelling performance and would allow John Deere Leasing to reap a windfall. Accordingly, the court finds the provision to be substantively unconscionable.

For the foregoing reasons, the court finds the lease provision which allows lessor to recover the option price upon lessee's breach to be unconscionable as a matter of law. Therefore, the court, in its discretion, will not enforce the lease provision.

Having so found, the court need not address defendant Blubaugh's alternate contention that Kansas Senate Bill 696 would afford him relief from liability.

IT IS ACCORDINGLY ORDERED this 24 day of June, 1986, that judgment should be and is hereby entered in favor of defendant Reuben D. Blubaugh, and against plaintiff John Deere Leasing Company.