(119 P.3d 670)

No. 93,121

GREGORY C. BENDER, Trustee, *Appellant*, v. KANSAS SECURED TITLE AND ABSTRACT CO., INC., and CHICAGO TITLE INSURANCE COMPANY, *Appellees*.

400 

 Opinion
filed September 16, 2005. 

*Edward G. Collister, Jr.,* of Collister & Kampschroeder, of Lawrence, for appellant.

*Arthur E. Palmer,* of Goodell, Stratton, Edmonds & Palmer, LLP, of Topeka, for appellee Kansas Secured Title and Abstract Co., Inc.

*J. Patrick Shepard* and *Joel B. Laner,* of Hazelton & Laner, LLP, of Kansas City, Missouri, for appellee Chicago Title Insurance Company.

Before RULON, C.J., GREENE and BUSER, JJ.

GREENE, J.: Gregory C. Bender, trustee of two trusts for·his children, appeals the judgment of the district court which held that the trusts, as purchasers of land conditioned on commitment of title, had sustained no legally cognizable damage caused by the negligence or breach of contract of defendants Kansas Secured Title and Abstract Co., Inc. (Kansas Secured Title), abstractor, and Chicago Title Insurance Co. (Chicago Title), title insurer, in connection with the trusts' purchase of land, even though the defendants admitted that a blanket easement covering the entirety of the property had been missed during their title search and that a natural gas pipeline crossed a portion of the property. We review the protracted proceedings in district court, discuss applicable principles of law for such disputes in Kansas, conclude that the district court erred in some regards, reverse the judgment, and remand for further proceedings with directions.

## *Factual and Procedural Background*

Bender is the trustee of two trusts for his children, Colton B. Bender and Skylar Louise Bender. On September 30, 1999, on behalf of the trusts, Bender purchased 160 acres of land located at S.E. 37th Street in Shawnee County, Kansas, near the Douglas County line. Bender purchased the property for $167,500, intending to develop a rural subdivision.

As part of the sales agreement, the seller agreed to provide Bender with marketable title and title insurance. Chicago Title issued the commitment for title insurance, with Kansas Secured Title serving as its agent and abstractor. The only material exception listed in the title policy was an easement to Martin Marietta Cor-

poration covering 1 acre in the corner of the property for an active quarry. After the closing, Bender received the title insurance policy, which stated in relevant part:

"4. DEFENSE AND PROSECUTION OF ACTIONS; DUTY OF INSURED CLAIMANT TO COOPERATE

. . . .

"(b) The Company shall have the right, at its own cost, to institute and prosecute any action or proceeding or to do any other act which in its opinion may be necessary or desirable to establish the title to the estate or interest, as insured, or to prevent or reduce loss or damage to the insured. The Company may take any appropriate action under the terms of this policy, whether or not it shall be liable hereunder, and shall not thereby concede liability or waive any provision of this policy. If the Company shall exercise its rights under this paragraph, it shall do so diligently.

. . . .

"(d) In all cases where this policy permits or requires the Company to prosecute or provide for the defense of any action or proceeding, the insured shall secure to the Company the right to so prosecute or provide defense in the action or proceeding, and all appeals therein, and permit the Company to use, at its option, the name of the insured for this purpose. Whenever requested by the Company, the insured, at the Company's expense, shall give the Company all reasonable aid (i) in any action or proceeding, securing evidence, obtaining witnesses, prosecuting or defending the action or proceeding, or effecting settlement, and (ii) in any other lawful act which in the opinion of the Company may be necessary or desirable to establish the title to the estate or interest as insured. . . .

. . . .

"7. DETERMINATION, EXTENT OF LIABILITY AND COINSURANCE

"This policy is a contract of indemnity against actual monetary loss or damage sustained or incurred by the insured claimant who has suffered loss or damage by reason of matters insured against by this policy and only to the extent herein described.

"(a) The liability of the Company under this policy shall not exceed the least of:

(i) the Amount of Insurance stated in Schedule A; or,

(ii) the difference between the value of the insured estate or interest as insured and the value of the insured estate or interest subject to the defect, lien or encumbrance insured against by this policy."

After the closing, Bender waited approximately 1 year to begin development. In August 2000, Bender met with a land surveyor, and they quickly began developing layouts of the subdivision with the goal of designing as many salable lots as feasible. Bender

wanted to get a plat on file with the county as quickly as possible because he was under the impression that "at any given time" Shawnee County might change its requirements for residential or rural development.

On September 10, 2000, while riding his four-wheeler across the property, Bender discovered for the first time what seemed to be an active pipeline on his property. Upon inquiry, Bender learned that it was an active natural gas pipeline owned by Williams Pipeline Company (Williams). Within 24 hours, Williams confirmed that it had a blanket easement across the entire property.

Bender contacted Kansas Secured Title with this information almost immediately. On September 15, 2000, Kansas Secured Title sent Bender a copy of Williams' right-of-way and a note confirming that the easement covered the entire quarter section. In this correspondence, Kansas Secured Title admitted that the easement had been missed during its title search. Bender hired an attorney and filed a claim with Chicago Title to recover the purchase price of the property because the blanket easement effectively foreclosed any development activity.

In December 2001, Bender received a proposed partial release from Williams, which would have narrowed the easement to 33 feet on each side of the pipeline. The instrument of release, however, required that Bender agree to "relieve Grantor of any liability or damage due to cathodically protected pipelines." According to Bender, it seemed "backwards" that he was asked to take on the liability of a pipeline that he was not aware of and that had not been an exception to his title commitment, and he refused to execute the partial release.

After further discussions with Chicago Title's attorney failed, Bender initiated this litigation on March 8, 2002, against both Kansas Secured Title and Chicago Title, based on contract and negligence, and requesting judgment of $167,500, plus interest and costs. Kansas Secured Title and Chicago Title answered, contending that Bender was limited by the policy to actual damages sustained by reason of the easement and that his damages were limited.

The district court conducted a bench trial in early July 2003 and issued its memorandum decision in September 2003, containing no discussion of Bender's negligence claims but concluding the language of the title insurance policy restricted recoverable damages to diminution in value. The court concluded that Bender had shown no such diminution in value

"so long as the defendants obtain an unconditional narrowing of the pipeline easement to 33 feet either side of the pipeline as it presently is located. Defendants are ordered to obtain without delay, either through negotiation or litigation, documents from Williams Gas Pipeline releasing the easement on all portions of plaintiff's property other than the 66-foot easement previously described. If defendants are unable to obtain such a release then the court will reopen this case for reconsideration of the damage issue."

In December 2003, pursuant to the court's order, the defendants procured and tendered to Bender a partial release narrowing the easement to the 66 feet containing the pipeline but containing the following language:

"It is further understood and agreed that Grantee will not erect, construct, or create any building, improvement, structure, or obstruction of any kind either on, above, or below the surface of the ground on the strip or tract of land above reserved and excepted unto Grantor, or change the grade thereof, or cause or permit these things to be done by others, without first having obtained the express written permission of Grantor. *The Grantee shall assume, indemnify, and save harmless Grantor, its successors and assigns, from all cost, loss, damage, expense, or claim of any nature arising from any acts of Grantee so permitted by Grantor or from the existence of any construction so permitted.* The covenants contained in this paragraph shall constitute covenants running with the land and shall be binding upon and inure to the benefit of the parties hereto, their personal representatives, heirs, successors, and assigns." (Emphasis added.)

In February 2004, the district court issued a second memorandum decision, concluding that the partial release satisfied the defendants' obligation under the title policy and the prior order of the court. Bender then asked the court to address its negligence claim against Kansas Secured Title and its claim for attorney fees. In July 2004, the district issued a third memorandum decision concluding that the negligence claim failed for the same reason that the contract claim failed, *i.e.*, that Bender had not suffered any damage. Attorney fees were denied.

Bender appeals.

## *Did the District Court Err in Concluding that Bender Had Sustained No Damages Caused by the Breach of Contract?*

### *Should the Policy Limitations on Liability be Enforced?*

Bender first challenges the district court's enforcement of contract language restricting cognizable damages to the lesser of purchase price (amount of insurance) or diminution of value. The interpretation and legal effect of written instruments are matters of law, and an appellate court exercises unlimited review. Regardless of the construction given a written contract by the trial court, an appellate court may construe a written contract and determine its legal effect. *Unrau v. Kidron Bethel Retirement Services, Inc.*, 271 Kan. 743, 763, 27 P.3d 1 (2001).

Citing *Gowing v. Great Plains Mutual Ins. Co.*, 207 Kan. 78, 80, 483 P.2d 1072 (1971), Bender maintains that because the title insurance policy is an adhesion contract, this court " 'must ascertain that meaning of the contract which the insured would reasonably expect.' " Bender suggests the typical land purchaser would reasonably expect the computation of damages to include actual loss caused by a title defect rather than the damage limitation clause contained in the policy.

The district court concluded in material part:

"The *Gowing* case does not stand for the proposition that all provisions of an insurance policy are inherently unconscionable. The test for whether a contract provision is unconscionable is set out in *Adams v. John Deere Co.*, 13 Kan. App. 2d 489, 774 P.2d 355 (1989). The *Adams* Court held that

'unless the provision in question is, under the circumstances, so outrageous and unfair in its wording or its application that it shocks the conscience or offends the sensibilities of the court, or is against public policy, it must be enforced.' 13 Kan. App. 2d at 492.

The provision in question defines the manner in which damages sustained by an insured under the policy are to be calculated. It provides that the insured's damage shall be the difference between the value of the property without the encumbrance and the value of the property with the encumbrance. Thus, if the value of the plaintiff's property has been reduced by the title defect he will be paid the amount by which the value has been reduced. This enables plaintiff to either retain or sell the property and remain whole."

We agree. Contrary to Bender's argument, *Gowing* does not generally hold that the court "must ascertain that meaning of the contract which the insured would reasonably expect." Instead, the rule adopted was that the test is what a reasonable person placed in the position of the insured would have understood the policy language to mean. *Gowing*, 207 Kan. at 82. Despite being a contract of adhesion, an insurance contract must be construed consistent with its plain and ordinary meaning in the absence of unconscionability or ambiguity. *First Financial Ins. Co. v. Bugg*, 265 Kan. 690, 694, 962 P.2d 515 (1998); see *St. Francis Hospital & School of Nursing, Inc. v. Eckman*, 212 Kan. 131, 133, 510 P.2d 175 (1973); *Ed Bozarth Chevrolet, Inc. v. Black*, 32 Kan. App. 2d 874, 886, 96 P.3d 272 (2003) ("It is to be emphasized that a contract of adhesion is not unconscionable per se, and that all unconscionable contracts are not contracts of adhesion.").

Here, we conclude that there is neither unconscionability nor ambiguity in the policy provisions restricting damages. Unconscionability is not shown because the language in the damage limitation clause does not appear to be one-sided, is precisely stated, and is not unfairly surprising and deceptive bargaining conduct has not been proven. See *Wille v. Southwestern Bell Tel. Co.*, 219 Kan. 755, 758-59, 549 P.2d 903 (1976); *Adams v. John Deere Co.*, 13 Kan. App. 2d 489, 496-98, 774 P.2d 355 (1989). The language is also not ambiguous. Courts should not strain to create an ambiguity where, in common sense, there is none. *First Financial Ins. Co.*, 265 Kan. at 694. Language in an insurance policy is not ambiguous unless there is genuine uncertainty as to which of two or more possible meanings is proper. 265 Kan. at 698. We believe the language limiting damages is not capable of more than one meaning: the liability of the insurer shall not exceed the lesser of the amount of insurance or the diminution in value suffered by reason of the title defect. The district court did not err in enforcing the liability limitation.

## Was There Evidence of Diminution in Value by Reason of the Easement?

Bender next argues that the district court erred in concluding that there was no diminution in value "so long as" defendants procured a narrowing of the easement. When a district court has made findings of fact as a basis for its legal conclusions, the function of an appellate court is to determine whether the trial court's findings of fact are supported by substantial competent evidence and whether the findings are sufficient to support the trial court's conclusions of law. Substantial evidence is such legal and relevant evidence as a reasonable person might accept as sufficient to support a conclusion. *U.S.D. No. 233 v. Kansas Ass'n of American Educators*, 275 Kan. 313, 318, 64 P.3d 372 (2003). An appellate court's review of conclusions of law is unlimited. *Nicholas v. Nicholas*, 277 Kan. 171, 177, 83 P.3d 214 (2004). " 'The court does not weigh conflicting evidence, pass on credibility of witnesses, or redetermine questions of fact.' [Citation omitted.]" *State ex rel. Morrison v. Oshman Sporting Goods Co. Kansas*, 275 Kan. 763, 775, 69 P.3d 1087 (2003).

Bender argues that at the time of trial the entire tract remained subject to the blanket easement and that "the land was valueless because merchantable title could not be given to a prospective purchaser." He contends that so long as he was precluded from using the property as intended, he was entitled to a return of the full purchase price, or "the amount of insurance."

At trial, the defendants offered evidence on the issue of diminution in value through the testimony of Robert Taggart, an appraiser who testified that, given his opinion of highest and best use of the property and as long as the easement could be narrowed, there was no diminution in value. In accepting Taggart's testimony, the district court reasoned in material part:

"The assumption made by Mr. Taggart that the easement can be narrowed is a correct assumption. His testimony is the only evidence before the court on the issue of the diminution in value. He testified that it is his expert opinion that there is no diminution in the value of plaintiff's property resulting from the existence of the pipeline easement once it is appropriately narrowed.

"Under paragraphs 4 and 6 of the *Conditions and Stipulations* contained in the title insurance policy Chicago Title has the right to negotiate or litigate for removal of the easement. Under paragraph 4 the plaintiff has a duty to cooperate. Chicago Title took some steps toward narrowing the easement and obtained a conditional release of portions of the easement that required plaintiff to execute a broad release of liability and indemnification agreement in favor of Williams. Plaintiff did not wish to sign this release of liability. However, plaintiff did not tell Chicago Title what its objections to the release were and thus, did not cooperate in obtaining the easement release. The court finds that under the measure of damages contained in the title policy Chicago Title is obligated to obtain a release of the easement over all portions of the plaintiff's property other than those portions necessary to carry out the purpose of the easement, which release should not require plaintiff to release Williams from liability and to indemnify Williams from loss."

We have numerous questions about this aspect of the district court's order, none of which seem to be addressed by the parties: Was the defendants' action in procuring the tender of a partial release "diligent" as required by the policy? Was it prudent for the district court to allow procurement of the release *after* trial where none had been procured at time of trial? Was Bender *required* to accept such an indemnification obligation given the limited cooperation required by the policy (policy required Bender only to aid in lawful act to "establish the title to the estate or interest *as insured*," not improve title to best available alternative)? Should not the parties have been limited at trial to evidence of diminution based upon the state of title at time of trial, *i.e.*, with the blanket easement covering the entire tract? Was the Taggart opinion of no diminution in value admissible given its apparent false assumption that an unconditional partial release of the easement could be procured? Notwithstanding these substantial concerns, the parties have not preserved any such issues in this appeal, and we decline to address or determine the appeal on issues not presented by the parties.

Following defendants' efforts to comply with the district court's initial order, the district court was faced with a dilemma: although Bender was offered a partial release of the easement, the instrument still required indemnification by the grantee. Without permitting any further evidence as to diminution of value, the district

court ultimately concluded that the indemnification requirement was not "unreasonable," stating:

> "The problem with plaintiff's argument [that the indemnification provision creates a liability that would not exist at common law] is that in order for the indemnification clause to come into effect, the plaintiff must place a building, improvement or structure on or change the grade of the land covered by the right-of-way easement. The owner of the servient estate does not have the right to interfere with the use of the right-of-way by the owner of the dominant estate. *Aladdin Petroleum Corporation v. Gold Crown Properties, Inc.*, 221 Kan. 579, 586, 561 P.2d 818 (1977). So long as plaintiff does not do any of those things, no liability is created for plaintiff. This paragraph merely allows plaintiff to use the land covered by the right-of-way in a manner not otherwise permitted, if he/she gets the permission of the owner of the right-of-way and assumes the liability for any damages caused by the use. The court does not find this restriction to be unreasonable under the circumstances. The plaintiff has not presented any evidence that the right-of-way easements existing on the property used by Mr. Taggart to support his opinion that such a right-of-way does not diminish the value of the property do not contain a similar restriction."

Bender argues on appeal that the district court erred by not "reconsider[ing] the damage issue since no 'unconditional' narrowed easement was secured as initially ordered." We agree.

First, we construe the proposed indemnification language as far more problematic than did the district court; clearly, it did not fulfill the terms of the court's initial order. Second, and more importantly, the district court failed to consider whether Bender's undertaking such an indemnification obligation would serve to diminish the value of Bender's interest in the land. We see no reason that appraisal testimony could not be offered on the question which remained after the final tender of partial release: what impact on fair market value, if any, has the proposed indemnification obligation? Clearly, there is no factual basis in the record for a conclusion that the indemnification obligation would not diminish value of the tract in the marketplace.

Based upon this analysis, we conclude that the district court erred in concluding that there was no diminution in value triggering liability under the policy without evidence addressing the impact of all provisions of the proposed release on market value. We

reverse and remand for further proceedings not inconsistent with this opinion.

### Did the District Court Err in Denying Relief Against the Defendant Kansas Secured Title on Bender's Theory of Negligence?

Bender next argues that the district court erred in concluding that his tort claim failed against the abstractor, Kansas Secured Title, because no damages were shown. Whether the district court applied the wrong measure of damages is a question of law, and our review is unlimited. *Werdann v. Mel Hambelton Ford, Inc.*, 32 Kan. App. 2d 118, 124, 79 P.3d 1081 (2003), *rev. denied* 277 Kan. 928 (2004); see *Tongish v. Thomas*, 16 Kan. App. 2d 809, 829 P.2d 916, *aff'd* 251 Kan. 728, 840 P.2d 471 (1992).

In holding against Bender, the district court reasoned:

"Basically, plaintiff contends that Kansas Secured Title negligently failed to discover the easement and list it as an exception in the title insurance commitment. It is undisputed that Kansas Secured Title did not discover the easement and that the easement is an impediment to plaintiff's title. However, plaintiff's claim against Kansas Secured Title must fail for the same reason that his Count I claim against Chicago Title on the title policy fails. In its February 19 memorandum decision the court found that with the proposed partial release of easement secured by Chicago Title pursuant to the court's original memorandum decision, plaintiff has not suffered any damage."

The unstated premise underpinning this conclusion is that the Bender's negligence claim against the abstractor must be evaluated with the same damage limitations and conditions as the contract claim against the title insurer. Obviously, if the abstractor's liability in tort is not entitled to be qualified by the terms and conditions of the title insurance policy, there was no contractual obligation of cooperation by Bender, there was no right of the abstractor to make diligent attempt to establish title after the fact of its purported negligence, there was no contractual ceiling on damages as the amount of insurance, there was no contractual measure of damage as diminution of value, and the district court's initial order that defendants procure a partial release would be an unusual outcome.

The threshold question, therefore, is whether an abstractor, against whom the real estate purchaser asserts a negligence claim,

is entitled to have its liability measured or restricted by the terms and conditions of the title insurance policy that may have been issued to the buyer in connection with the same transaction. This is a difficult question that may not have been considered by the district court. If the answer to the question as framed is "yes," we must reverse the district court's conclusion that Bender's negligence claim failed because the district court impliedly imposed the contractual terms and conditions in measuring damages for negligence. If the answer to the question as framed is "no," we must reverse on the same grounds as we reversed on the contract claim. The only practical difference may be the scope and nature of proceedings on remand.

At the outset, we review the traditional claims that may arise upon failure of title in a real estate transaction. Generally, a title insurer is strictly liable in contract for covered losses resulting from title defects not reported to the insured and not excepted or excluded from coverage by a policy provision. 11 Thompson on Real Property § 93.01, p. 226 (2d Thomas ed.). In Kansas, an abstractor is liable for all negligent errors and omissions not only to his or her employer but to all persons who purchase or invest in land relying on an abstract furnished for that purpose and without regard to privity. *Ford v. Guarantee Abstract & Title Co.*, 220 Kan. 244, 259, 553 P.2d 254 (1976), *disapproved in part on other grounds Guarantee Abstract & Title Co. v. Interstate Fire & Cas. Co.*, 232 Kan. 76, 78, 652 P.2d 665 (1982). Accordingly, in the most typical real estate transactions, the purchaser who suffers failure of title after requiring a title commitment as a condition of purchase has a claim based in contract against the title insurer and a claim based in tort against the abstractor. (See *Ford*, 220 Kan. at 254-58, for an overview of the relationship between abstractor and insurer and their respective liability as the law has evolved in Kansas.) The difference between a tort and a contract action is that a breach of contract is a failure of performance of a duty arising under or imposed by agreement, whereas a tort is a violation of a duty imposed by law. *Atkinson v. Orkin Exterminating Co.*, 230 Kan. 277, 634 P.2d 1071 (1981) (adopting 5 Kan. App. 2d 739, 625 P.2d 505 [1981]).

In determining whether tort liability of an abstractor must be measured with the benefit of title insurance terms and conditions, we rely heavily upon the analysis and supporting authorities cited by our Supreme Court in its hallmark case establishing tort liability of an abstractor. In this case, our Supreme Court cited with apparent approval a Michigan Supreme Court decision to conclude that contractual privity should not be required as a condition of abstractor liability. See *Ford*, 220 Kan. at 259 (citing *Williams v. Polgar*, 391 Mich. 6, 215 N.W.2d 149 [1974]). In the Michigan case, that court was compelled to address the issue whether such liability should be governed by the statute of limitations applicable to tort actions or that applicable to contract actions. The court adopted the tort standards, holding that "there is a valid tort cause of action *in the nature of negligent misrepresentation* arising from a contract for an abstracter's services in favor of a non-contracting damaged third-party whose reliance on the abstract could be foreseen." (Emphasis added.) 391 Mich. at 26. Moreover, the statute cited by our Supreme Court in *Ford* measures the adequacy of an abstractor's bond as "payment by the applicant of *any and all actual damages that may be sustained.*" (Emphasis added.) K.S.A. 58-2802(b)(2).

Given our Supreme Court's apparent approval of the *Williams* rationale and conclusion, and its reliance on the abstractor's bond statute as providing guidance in such matters, consistency would dictate that liability of an abstractor should be evaluated as an independent tort or negligent misrepresentation action, including application of the same measure of damages, and we so hold.

Applying our holding to the record before us, we conclude that the district court erred in holding that Bender's negligence claim against Kansas Secured Title failed by reason of his failure to have shown damages on that claim. The district court's finding was premised on the erroneous assumption that the measure of damages for the tort claim was identical to the measure of damages for the contract claim, and that all terms and conditions of the policy regarding the insurer's opportunity to establish title, the obligation of Bender to aid in such opportunity, and the express limitation on amount of recoverable damages are simply not applicable to the

tort claim against the abstractor. Accordingly, we reverse the district court's conclusion and judgment against Bender and remand for further proceedings not inconsistent with this opinion.

### Summary and Conclusion

Summarizing our holdings, the district court's judgments against Bender and in favor of Kansas Secured Title and Chicago Title are reversed. On remand, the district court is directed to determine the contractual liability of Chicago Title based upon evidence of diminution of value, if any, as a result of the language contained in any partial release that has been tendered at time of trial on remand. The court is also directed to determine the tort liability of Kansas Secured Title based strictly upon tort principles and without regard to contractual terms and conditions; this means, for example, that the current state of title without regard to mere tender of partial release shall be the benchmark for assessment of Bender's damages, unless it can be shown that Bender has failed to mitigate losses under traditional tort mitigation analysis. See *Noel v. Pizza Management, Inc.*, 258 Kan. 3, 14, 899 P.2d 1013 (1995).

Reversed and remanded with directions.